**ATLANTIC TELE–NETWORK, Plaintiff,**

v.

**Jeffrey J. PROSSER, Defendant.**

**No. CIV. A. 99–236(SSB).**

District Court, Virgin Islands, D. St. Thomas and St. John.

Dec. 8, 2000.

**634**

Karl A. Groskaufmanis, David B. Wiseman, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, Attorneys for Plaintiff.

George Wailand, James E. Rosenfeld, Cahill Gordon & Reindel, New York, NY, Attorneys for Defendant.

## OPINION ON MOTION TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

## I. *INTRODUCTION*

This case arises under § 16(b) of the Securities and Exchange of 1934, which prohibits "short-swing" securities transactions by corporate insiders and allows companies to recoup profits made on such transactions. Plaintiff Atlantic Tele Network ("ATN") seeks to disgorge profits made by defendant Jeffrey Prosser, a former officer of ATN, on an alleged purchase and subsequent sale of ATN stock in the midst of the company's December 1997 reorganization. Presently before the Court are Prosser's motion to dismiss for failure to state a claim, ATN's motion for summary judgment, and Prosser's cross-motion for summary judgment. For the reasons set forth below, Prosser's motion to dismiss will be granted, leaving no need to consider the motions for summary judgment.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

Prior to Dec. 30, 1997, ATN was a publicly held corporation that provided telecommunications services in the Virgin Islands and Guyana. It provided these services through ATN–VI, a wholly owned subsidiary, and Guyana Telephone and Telegraph, of which it was an 80 percent owner. Jeffrey Prosser, the defendant, and Cornelius Prior were the principal stockholders and co-chief executive officers of ATN. In order to resolve a management deadlock between Prosser and Prior, the ATN Board of Directors in July 1997 approved a series of transactions that split ATN into two separate publicly held companies, ATN and Emerging Communications, Inc. ("ECI"). ECI, now controlled by Prosser, acquired the Virgin Islands side of the old company; ATN, now controlled by Prior, retained the Guyana business. (Pl.'s Mem. Opp'n. Mot. Dismiss at 3.)

This "split-up" transaction, consummated on Dec. 30, 1997, unfolded as follows: ATN transferred all of its Virgin Islands assets and liabilities to ECI in exchange for all of the capital stock of ECI. ATN then repurchased about one-fourth of the ATN common stock controlled by Prior. Next, ATN created two new classes of stock, Class A and Class B. Prior then exchanged his remaining shares of ATN stock for the same number of shares of the new Class B stock, and Prosser exchanged his remaining 3,325,000 shares for the same number of shares of the new Class A stock. At this point, Mergerco, a newly created subsidiary of ATN with no assets, merged into ATN. Public shares of ATN were converted into the right to receive four-tenths of a share of the new ATN and one share of ECI stock. Prosser's outstanding shares of ATN Class A were converted into the right to receive 5,704,-931 shares of ECI stock (a ratio of about 1.71 ECI shares for each ATN share), and Prior's outstanding Class B shares were similarly converted into the right to receive 2,807,040 shares of ATN common stock. (Def.'s Mem. Supp. Mot. Dismiss at 3.) Both Prosser and Prior exercised these rights, giving them control over ECI and ATN, respectively. The terms of all these exchanges were included in the split-up transaction as initially approved. (Pl.'s Mem. Opp'n. Mot. Dismiss at 4.)[1]

On Dec. 18, 1997, twelve days prior to the split-up transaction in which he disposed of his ATN stock, Prosser acquired at least 250,000 shares of ATN stock. ATN has identified this transaction as the basis for its claim under § 16(b). There is some confusion as to the details of this acquisition, however, due to documentation that either points to a similar but separate transaction or instead erroneously describes the Dec. 18 transaction.

In a Mar. 16, 1998, letter to his attorneys (Pl.'s Stmt. Mat. Facts, Ex. C, Annex E), Prosser described the Dec. 18 acquisition as a "purchase" of 250,000 shares at $10.75 per share. In an Apr. 16, 1998, form filed with the Securities and Exchange Commission ("SEC") (*Id.*, Ex. A), Prosser listed 250,000 shares as "securities

---

1. In response to the Court's questioning at oral argument held on August 30, 2000, the parties submitted supplemental briefs explaining the roles Mergerco and the merger played in the transaction. The parties agree that in order to accomplish the objective of the split-off transaction, it was necessary that Prosser, Prior, and the ATN shareholders each receive different forms of consideration. On advice of counsel, ATN concluded that a merger would be a permissible vehicle for providing different forms of consideration, whereas other transactional structures, such as a "dividend-type spin-off," would not. (Pl.'s Suppl. Br. at 2; Def.'s Suppl. Br. at 2.)

acquired" on Dec. 18 at a price of $10.75. Meanwhile, another SEC form filed by Prosser on Jan. 9, 1998, identifies what appears to be a second, separate acquisition of 257,000 ATN shares on Dec. 30, 1997 at prices of $11.75 to $11.875 per share. (Pl.'s Stmt. Mat. Facts Ex. B.) Prosser then uses the two blocks of shares interchangeably in his brief opposing ATN's motion for summary judgment. Citing an affidavit of one of his advisors, Prosser states that the 250,000 shares were acquired on Dec. 18 from Cartona, Ltd., a corporation wholly owned and controlled by Prosser. (Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 5.) Yet, the affidavit itself states that the Cartona shares are the 257,000 block and is silent about the precise date of acquisition. (Raynor Aff. ¶¶ 3–4.) [2]

Prosser has now submitted supplemental affidavits averring that previous references to 250,000 shares were in error and that there was only one block of stock: 257,000 shares, transferred from Cartona to John Raynor, Prosser's trustee, on Dec. 18 and from Raynor to Prosser on Dec. 30. (Prosser Aff. of Aug. 18, 2000, ¶¶ 2, 3; Raynor Suppl. Aff. ¶¶ 3–6.)

There is also some dispute as to the prices to be assigned, for purposes of calculating profits, to the various shares at issue. ATN relies upon the acquisition price of $10.75 per share of ATN stock listed in Prosser's Mar. 16, 1998, letter and Apr. 16, 1998, SEC form. It also proffers news reports that the selling price of ECI on its opening day, Dec. 31, was between $8.25 and $8.675. Employing the alleged $10.75 acquisition price for ATN, the alleged $8.675 opening value of ECI, and the

1.71 conversion ratio, ATN calculates Prosser's short-swing profit on the transaction at $1,011,719.20. (Pl.'s Stmt. Mat. Facts ¶ 7.) Prosser, however, now contends that the $10.75 figure for ATN that he reported to his attorneys and the SEC was in error; he submits a newspaper excerpt to show that on Dec. 18 ATN actually traded at between $11.75 and $11.875. (Rosenfeld Aff. Ex. A.) Prosser also disputes that the ECI value should be used to calculate his profits, arguing that the consideration he received in his sale of ATN was ATN Class A, not ECI stock. Finally, if the ECI stock is to be used in calculating his profits, Prosser presents evidence that the actual trading price of ECI on Dec. 31 was between $7.875 and $8.25. (Rosenfeld Aff. Ex. C.)

## III. *MOTION TO DISMISS*

### A. Legal Standard

In considering whether a complaint should be dismissed for failure to state a claim upon which relief can be granted, the Court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *ALA v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994) (citations omitted); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991) (citations omitted). The Court cannot dismiss plaintiff's complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (citations omit-

**2.** Raynor further avers that the 257,000 shares are those described in the Dec. 9, 1997, proxy statement that ATN issued in connection with the split-up transaction. (Raynor Aff. ¶ 5.) The proxy statement in-

cludes "257,000 shares as to which Mr. Prosser has an option to purchase" among the 3,325,000 shares owned by Prosser. (Prosser Aff. of June 12, 2000, Ex. 1.)

ted); *D.P. Enterprises, Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984).

## B. Discussion

Section 16(b) of the Securities and Exchange Act of 1934 allows a public company to recover profits made by its directors, its officers and certain shareholders "from any purchase and sale, or sale and purchase, of any equity security of [the company] within any period of less than six months." 15 U.S.C. § 78p(b). Defendant does not dispute that plaintiff states a prima facie case for disgorgement of profits under § 16(b). Instead, Prosser contends that two exemptions apply to his transaction. First, he argues that his sale of shares is exempt because it was a board-approved disposition to the shares' issuer. Second, he argues that the sale is exempt because it was done in connection with a merger. ATN disputes the applicability of both exemptions, arguing that the ATN board's approval of the transaction was not sufficient under § 16(b) and that the disposition cannot be characterized as merger-related. Additionally, ATN contends that the Securities and Exchange Act imposes a requirement that Prosser have relied on a specific exemption at the time of the transaction—a standard Prosser manifestly cannot meet.

### 1. *Exemption for Dispositions to Issuer*

■ SEC Rule 16b–3(e) exempts from § 16(b) liability "[a]ny transaction involving the disposition to the issuer of issuer equity securities, provided that the terms of such disposition are approved in advance" by the issuer's board of directors or stockholders. 17 C.F.R. § 240.16b–3(d), (e). The exemption is based on the premise that transactions between the issuer and its officers and directors generally are not vehicles for the speculative abuse that § 16(b) was intended to prevent: "[T]hese transactions do not appear to present the same opportunities for insider profit on the basis of non-public information as do market transactions by officers and directors." Ownership Reports and Trading by Officers, Exchange Act Release No. 37260, [1995–1996 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,810, at 88,059 (May 31, 1996). On its face, the exemption squarely applies to Prosser: he disposed of his 3,325,000 shares to the issuer, ATN, in a transaction that the ATN board had approved as part of the split-up.

Note 3 to the rule, however, explains that the board approval must meet certain requirements in order for the exemption to apply:

> The approval conditions [for the exemption] require the approval of each specific transaction, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan.

17 C.F.R. § 240.16b–3 n. 3. The SEC has given Note 3's specific-approval language a rather opaque interpretation. In two 1999 "no action" letters, the agency staff stated that the disposition-to-issuer exemption requires board approval that manifests an intent to exempt the transaction from § 16(b) liability. *See* American Bar Ass'n, SEC No–Action Letter, [1999 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,526, at 78,613–14 (Feb. 10, 1999) ("In order to satisfy the specificity requirements of Note 3 to Rule 16b–3 ... the approving entity must know and the document evidencing the approval must specify ... that the approval is granted for purposes of making the transaction exempt under Rule 16b–3."); Skadden, Arps, Slate, Meagher & Flom LLP, SEC No Action Letter, [1999

Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,515, at 78,565–66 (Jan. 12, 1999) ("If full board approval . . . is to be relied upon to exempt the transactions, this approval must specify . . . [t]hat the approval is granted for purposes of exempting the transaction under Rule 16b–3.").[3] Additionally, the release accompanying the SEC's 1996 amendments to Rule 16b, which added the disposition-to-issuer exemption, appears to contemplate purpose-specific approval where the exemption is to be based on stockholders' assent: "If shareholder approval is solicited and is to be the condition relied upon for exemption, the proxy card and proxy statement both should provide that a vote to approve the merger also shall constitute a vote to approve insiders' exempt dispositions. . . ." Ownership Reports and Trading by Officers, Fed. Sec. L. Rep. (CCH) at 88,066. While by its terms this language addresses only shareholder approval, ATN contends that the 1996 release is indicative of a policy of purpose-specific approval underlying Rule 16b–3. Thus, ATN argues, the references to purpose-specific board approval in the Skadden and ABA letters merely make explicit a requirement that was implicit all along.

Applying this interpretation, the disposition-to-issuer exemption clearly would not be available to Prosser. The record is devoid of any indication that the ATN

board approved Prosser's transaction with the purpose of exempting him from § 16(b). The Court must thus determine whether the SEC's interpretations of Rule 16b–3, as set forth in the 1999 letters, should control in this matter. Additionally, the Court must decide whether the 1996 SEC release has any bearing on this dispute. Proceeding in the order of the documents' release, the Court will address the latter question first.

### a. 1996 Release

As noted above, ATN contends that the 1996 release evinces an intent on the part of the SEC to require purpose-specific approval regardless of whether shareholder or board approval is relied upon. In this view, the release's language regarding a shareholder-approval situation is simply a specific example of the general policy that the approval must manifest intent to exempt the transaction. Such a policy would be worthy of deference as evidence of the SEC's intent at the time of Rule 16b–3's promulgation. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386–87, 129 L.Ed.2d 405 (1994)

Upon a careful reading, however, the Court does not believe that the relevant language of the release, taken in context, imposes any general requirement of purpose-specific approval. The section of the

---

**3.** In addition to the two 1999 letters, ATN cites a third SEC letter in support of the requirement of purpose-specific approval. In General Motors Corp., SEC No Action Letter, [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,860 (May 19, 2000), the SEC staff stated:

> [T]he specificity of approval condition set forth in Note 3 to Rule 16b–3 will be satisfied if the Board of Directors . . . adopts resolutions that . . . for each named tendering officer or director of General Motors (a) approve the disposition of shares . . . based on the specific number of shares tendered

by each named person, and (b) based on the specific exchange ratio set forth in the exchange offer documents, approve the acquisition of shares . . . by each named person. . . .

*Id.* at 76,947. Nothing in the letter's language, however, suggests that a board must state its purpose in approving the specific dispositions of shares. That the General Motors board's intent would be manifest was simply the result of the company having solicited SEC advice on the disposition-to-issuer exemption.

release dealing with Rule 16b–3 approval reads:

> The exemption, which was favorably received by commenters, is adopted substantially as proposed. A note has been added to the new rule to clarify that if the terms of a subsequent transaction are provided for in the transaction as initially approved, the subsequent transaction does not require further specific approval. For example, the exemption will apply to the disposition to the issuer of a derivative security upon its exercise or conversion, if such exercise is pursuant to the terms provided in the derivative security as initially approved in its acquisition.
>
> In the context of a merger, the new rule will exempt the disposition of issuer equity securities (including derivative securities) solely to the issuer, provided the conditions of the rule are satisfied. Dispositions of such securities to parties other than the issuer, such as an acquiror, are not covered by the rule and consequently would not be eligible for exemption under the rule. The specific terms of the disposition, including price, will require prior approval of either the full board, the committee of Non–Employee Directors or shareholders. If shareholder approval is solicited and is to be the condition relied upon for exemption, the proxy card and proxy statement both should provide that a vote to approve the merger also shall constitute a vote to approve insiders' exempt dispositions of issuer equity securities to the issuer.

Ownership Reports and Trading by Officers, Fed. Sec. L. Rep. (CCH) at 88,066 (footnotes omitted).

As the section's second sentence indicates, this section was included to explain that, when the terms of a subsequent transaction are set forth in the initial, approved transaction, no further specific approval is required. The release then relates how this principle would be applied where, as was the case in the ATN transaction, merger approval is followed by transactions related to that merger. The release provides an example of shareholder approval, but not board approval. In the case of shareholder approval, the paragraph explains that shareholders must know they are voting on both the merger and on any transactions for which an exemption might later be sought. Presumably, this is because shareholders who approve a merger may not be authorizing—or have knowledge that they are authorizing—the specific transactions which will be undertaken in connection with that merger. Thus, information about those transactions must be placed on the proxy materials in order to satisfy Note 3's requirement of "approval of each specific transaction." 17 C.F.R. § 240.16b–3 n. 3. That this constitutes a "vote to approve insiders' exempt dispositions"—the language upon which ATN bases its argument—reflects not a requirement of purpose-specific approval but simply the inclusion, in the approval, of the dispositions for which exemptions will be sought. This understanding explains why the release does not set forth similar requirements for board approval. The board will have knowledge of the transactions because it must approve them all, either at the time of approving the merger or thereafter. Thus, it is doubtful that the release even establishes a purpose requirement at all, much less a policy of general applicability. Accordingly, the document cannot form the basis for barring Prosser's use of the Rule 16b–3(e) exemption.

### b. 1999 SEC letters

Although the 1996 release is inapplicable, the SEC's Skadden and ABA letters

clearly impose a purpose requirement. The question therefore becomes whether to give these letters controlling weight. Ordinarily, "an agency's construction of its own regulations is entitled to substantial deference." *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117·(1991); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). Thus, the agency's interpretation must be given controlling weight "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. at 2386–87 (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988)). Nonetheless, "'[t]he responsibility to promulgate clear and unambiguous standards'" rests with the agency. *Conn. Gen. Life Ins. Co. v. Comm'r,* 177 F.3d 136,. 144 (3d Cir.1999) (quoting *Director, Office· of Workers' Compensation Programs v. Eastern Associated Coal Corp.,* 54 F.3d 141, 147 (3d Cir.1995)). Thus, a court's deference to an agency's interpretation is tempered by its duty to independently ensure that the agency's interpretation comports with the regulatory language. *See Conn. Gen. Life Ins. Co.,* 177 F.3d at 144.

As an initial matter, there is some question with respect to whether the Skadden and ABA letters should be characterized as "no action letters," which are "statements of the SEC's intent not to prosecute a potential rule violation." *New York City Employees' Retirement System v. SEC,* 45 F.3d 7, 13 (2d Cir.1995) ("NYCERS"). Such letters, because they are factspecific, informal, and do not bind the parties or agency, generally are entitled to less deference than other agency pronouncements. *See id.* at 13–14; *see also Amalgamated Clothing & Textile Workers Union v. SEC,* 15 F.3d 254, 257 (2d. Cir.1994) ("ACTWU").[4] Both the Skadden and ABA documents have been labeled "no action letter," presumably by either the SEC or the reporting service. *See* ABA No–Action Letter, Fed. Sec. L. Rep. (CCH) at 78,609; Skadden No–Action Letter, Fed. Sec. L. Rep. (CCH) at 78,562. ATN contends that this characterization is inaccurate because the SEC does not enforce § 16(b); the agency instead relies on aggrieved companies to bring actions for disgorgement of profits. Thus, plaintiff contends, the SEC cannot be said to issue no-action letters regarding a law under which it has no power to prosecute. ATN therefore urges that the Skadden and ABA letters be viewed as interpretive releases of more general applicability. Yet there are good reasons why the letters should be treated as the equivalent of no-action letters for the purpose of determining the level of deference owed them. Like no-action letters, these documents are brief responses to a particular factual scenario posed by a party to a transaction, and as such do not purport to set forth general statements of the law. Moreover, like no-action letters,

---

4. The SEC acknowledges that no-action letters "have no binding effect on the parties addressed·in the letters." *ACTWU,* 15 F.3d at 257. Nor do such letters bind the SEC or the courts. *See NYCERS,* 45 F.3d at 12. "A necessary corollary of this proposition," the *NYCERS* court stated, "is that rules announced in no-action letters also have no binding authority." *Id.* at 14. A lesser degree of deference to no-action letters is also warranted because they have not been through procedural checkpoints such as notice and comment. *See American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1111 (D.C.Cir.1993); *see also NYCERS,* 45 F.3d at 14 ("Agency rules that have not undergone notice and comment receive much closer scrutiny from the courts than do those that have cleared the procedural hurdles.").

these documents are informal statements of SEC staff positions and are neither the official views of the SEC nor the product of formal rulemaking procedures. *See* 17 C.F.R. § 202.1(d).

Applying even a high level of deference, however, the Court declines to invoke the purpose requirement of the Skadden and ABA letters in this case. That the letters likely are owed less regard merely buttresses this decision, which rests on three grounds.

First, the purpose requirement contained in the SEC letters is clearly inconsistent with the language of the regulation. Neither Rule 16b–3(e), which requires that "the terms of such disposition be approved in advance," nor Note 3, requiring "approval of each specific transaction," contains any suggestion that a board of directors must state its purpose for approving the transaction.

Second, even were the Court to view the SEC letters as consistent with the regulation, the fact-specific nature of those documents counsels against applying their requirement of purposespecific approval in this case. Both the Skadden and ABA letters dealt with factual scenarios requiring novel applications of the disposition-to-issuer exemption. The Skadden letter involved dispositions in which the consideration was furnished by an acquiror, not an issuer. *See* Skadden No Action Letter, Fed Sec. L. Rep. (CCH) at 78,562. The ABA letter involved transactions between the issuer's insiders and subsidiaries of the issuer, rather than the issuer itself. *See* ABA No Action Letter, Fed. Sec. L. Rep. (CCH) at 78,610. It is possible that the SEC required purpose-specific approval in these contexts to ensure that the issuers knew these transactions, which did not fall squarely within the Rule 16b–3 exemption, would nonetheless be exempted. In the absence of even a suggestion of the letters'

purpose requirement in the rule itself, the Court declines to apply that requirement to the ATN transaction, which possesses none of the distinguishing features of the ABA and Skadden scenarios.

Third, even if the SEC letters' purpose requirement should be applied generally, the Court would be reluctant to apply it retroactively. The ATN split-up transaction took place in late 1997, and the Skadden and ABA letters were issued more than a year later. Due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). A court cannot defer to an agency's interpretation of its rules "if doing so would penalize an individual who has not received fair notice of a regulatory violation." *Upton v. SEC,* 75 F.3d 92, 98 (2d Cir.1996); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *cf. South Coast Servs. Corp. v. Santa Ana Valley Irrigation Co.,* 669 F.2d 1265, 1271 n. 3 (9th Cir.1982) (electing not to apply SEC releases where the proxy materials at issue predated the releases' formulation). This principle applies, albeit with less force, even if the rule in question carries civil, rather than criminal, penalties. *See Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. at 1194; *Upton,* 75 F.3d at 98. Although a relaxed standard of notice applies to civil, and particularly economic regulation, *see Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193; *Rock of Ages Corp. v. Sec'y of Labor,* 170 F.3d 148, 155 (2d Cir.1999), the Court doubts Prosser had sufficient warning that failure to secure purpose-specific board approval of his sale of shares to ATN might result in a § 16(b) violation. Only the 1996 release could possibly have provided such notice,

and, for the reasons discussed in the previous section, that release does not provide an adequate basis from which to conclude that purpose-specific board approval is required.

■ In light of the above factors, the Court will not employ the Skadden and ABA letters' interpretations of Rule 16b–3 in this case. Because the 1996 release is also inapplicable, the Court finds no requirement in the rule that board approval manifest an intent to exempt the transaction from § 16(b) liability. Accordingly, the disposition-to-issuer exemption is applicable to Prosser's sale of shares to ATN.

### 2. *Requirement of Good Faith*

■ ATN argues that even if an exemption to § 16(b) liability is applicable to the transaction, Prosser cannot avail himself of it because he did not rely in good faith upon any exemption at the time of the transaction. ATN finds a requirement of good faith in § 23(a) of the Securities and Exchange Act, which provides as follows:

> No provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in conformity with a rule, regulation, or order of the Commission ... notwithstanding that such rule, regulation or order may thereafter be amended or rescinded or determined by judicial or other authority to be invalid for any reason.

15 U.S.C. § 78w(a)(1). ATN then applies the converse proposition—that liability will attach where a party does not rely in good faith upon a regulation—citing, among other cases, *Brenner v. Johnson,* 328 F.Supp. 149, 152 (E.D.Wis.1971) ("[If] the record does not establish that [the defendant] in any way relied on the rule ... § 23(a) is ... inapplicable.").

ATN's interpretation of § 23(a) and cases such as *Brenner* is erroneous. In *Brenner,* the court held invalid a particular interpretation of another exemption to § 16(b). *See id.* at 152. The defendant then sought to invoke the protection of § 23(a), arguing that he had relied on the invalid interpretation in good faith. *See id.* As *Brenner* demonstrates, § 23(a) does nothing more than create a safe harbor for parties that rely on a rule which is subsequently changed or reinterpreted. ATN argues that § 23(a)'s "good faith" and "notwithstanding" clauses can be read separately, imposing a general requirement of good faith when any exemption is invoked. Yet, despite ATN's assertion to the contrary, all of the cases it cites for this proposition involve a party's reliance upon a rule or interpretation that was later changed or called into question. *See Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1294 (2d Cir.1973) (declining to impose liability where party had relied upon an SEC interpretation that the agency altered during the litigation); *Greene v. Dietz,* 247 F.2d 689, 695 (2d Cir.1957) (applying § 23(a) in defendant's favor where he was liable under new version of rule but had relied upon the old); *Colema Realty Corp. v. Bibow,* 555 F.Supp. 1030, 1038–1040 (D.Conn.1983) (holding that defendants were immune from liability where they relied on SEC interpretation but court imposed new one); *Van Aalten v. Hurley,* 176 F.Supp. 851, 854–856 (S.D.N.Y.1959) (holding that defendants were exempt from liability even if the exemption upon which they relied was invalid); *Emerson Elec. Mfg. Co. v. O'Neill,* 168 F.Supp. 804, 805 (E.D.Mo.1958) (excusing defendants from liability where, upon advice of counsel, they relied upon rule that was later called into question by plaintiffs); *Lockheed Aircraft Corp. v. Rathman,* 106 F.Supp. 810, 814 (C.D.Cal.1952) (exempting from liability corporate officer who was outside scope of old rule but fell within scope of new rule). Notably, in *Van Aal-*

*ten,* the court explains that § 23(a)'s purpose is "to provide that persons who act in good faith in conformity with any rule or regulation of the Commission ... shall not be subjected to liability if such rule or regulation is subsequently rescinded or invalidated for any reason." *Van Aalten,* 176 F.Supp. at 854–55 (S.D.N.Y.1959) (quoting S.Rep. No. 1739, at 4 (1936)). Section 23(a) simply does not bear on situations where, as here, no rule was rescinded or invalidated.

Because § 23(a) is inapplicable in this case, Prosser remains entitled to an exemption from § 16(b) liability for his board-approved disposition of ATN shares to ATN. Therefore, ATN's claim must be dismissed.

### IV. *CONCLUSION*

For the reasons stated herein, defendant's motion to dismiss for failure to state a claim will be granted. Accordingly, the parties' respective motions for summary judgment need not be considered and will be denied as moot.