**Frank GRYL, for the benefit of SHIRE PHARMACEUTICALS GROUP PLC and Barbara Gryl, for the benefit of Shire Pharmaceuticals Group PLC, Plaintiffs–Appellants,**

v.

**SHIRE PHARMACEUTICALS GROUP PLC, Zola Horovitz, Ronald Nordmann and John Spitznagel, Defendants–Appellees.**

**No. 01–9139.**

United States Court of Appeals, Second Circuit.

Argued: May 30, 2002.

Last Supplemental Briefs Filed: July 12, 2002.

Decided: Aug. 05, 2002.

---

David Lopez, Southampton, NY, (David Corsi, Carle, Mackie, Power & Ross, LLP, Santa Rosa, CA, of counsel), for Plaintiffs–Appellants.

Ian Rosenberg, Cahill Gordon & Reindel, New York, NY, (Jonathan D. Thier and Catherine Smith, of counsel), for Defendant–Appellee Shire Pharmaceuticals Group PLC.

Thomas A. Arena, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, (Richard E. Rosberger and John A. Boyle, on the brief), for Defendants–Appellees Zola Horovitz, Ronald Nordmann and John Spitznagel.

Giovanni P. Prezioso, Washington, DC, (Eric Summergrad and Allan A. Capute, on the brief), submitted a brief for amicus curiae Securities and Exchange Commission.

Before STRAUB, SOTOMAYOR, Circuit Judges, and GOLDBERG, Judge.*

STRAUB, Circuit Judge.

Plaintiffs–Appellants Frank and Barbara Gryl, suing on behalf of Nominal Defendant Shire Pharmaceuticals Group PLC ("Shire"), seek to compel the disgorgement of short-swing profits realized through the acquisition and sale of Shire securities by Defendants–Appellees Zola Horovitz, Ronald Nordmann and John Spitznagel (the "individual defendants"). The plaintiffs are shareholders of Shire and the individual defendants serve on Shire's board of directors. This derivative suit is actionable pursuant to Section 16(b) of the 1934 Securities Exchange Act, which provides in pertinent part:

> For the purpose of preventing the unfair use of information which may have been obtained by ... [a] director ... by reason of his relationship to the issuer, any profit realized by him from any purchase and sale ... of any equity security of

---

* The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such ... director ... in entering into such transaction.... Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction ... by the owner of any security of the issuer in the name and in behalf of the issuer....

15 U.S.C. § 78p(b).

The United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*) dismissed the complaint after determining that the individual defendants' receipt and sale of Shire securities, despite having wholly occurred within a period of less than six months, nonetheless fell within three different exemptions to Section 16(b)'s prohibition against short-swing profit taking by issuer insiders. For the reasons set forth below, we affirm the judgment of the District Court based on Rule 16b–3(d)(1), the exemption for issuer-to-insider transactions approved by the issuer's board of directors.

## BACKGROUND

The securities transactions that are the subject of this lawsuit are rooted in a corporate merger wherein Roberts Pharmaceutical Corporation ("Roberts") became a wholly-owned subsidiary of Shire (the "Merger").[1] Prior to the Merger—which became effective at 9:30 a.m. on December 23, 1999—the individual defendants were stock option holders and directors of Roberts. One of the changes wrought by the Merger was that the individual defendants became directors of Shire, although the parties dispute whether that event technically occurred instanta-

neously with or subsequent to the Merger. Additionally, the Agreement and Plan of Merger Among Shire and Roberts (the "Merger Agreement") called for all existing Roberts stock options to be automatically converted into Shire options at the moment the Merger became effective:

[At the Effective Time,] Shire shall assume or replace such Options (or fraction thereof) so that each holder of an Option (an "Optionee") shall have such Optionee's Option apply to that number of Ordinary Shares (adjusted to the nearest whole share) equal to the product of (i) the number of all Options of such Optionee immediately prior to the Effective Time and (ii) the Exchange Ratio. The exercise price per share for each Optionee's Options (adjusted to the nearest pence) assumed or replaced will equal the old exercise price per share of Common Stock divided by the Exchange Ratio.... Without limiting the foregoing, the duration and other terms of each assumed or replaced Option immediately after the Effective Time ... shall be the same as the corresponding Options that were in effect immediately before the Effective Time, except that all references to Roberts in the Roberts Option Plans (and the corresponding references in each option agreement documenting each such Option) shall be deemed to be references to Shire or the Surviving Corporation, as applicable....

Merger Agreement art. VI, ¶ 6.1(a). It is undisputed that less than six months after acquiring their converted Shire options, each of the individual defendants exercised all or a portion thereof and sold those shares for a profit.

The plaintiffs filed this stockholder derivative action on December 4, 2000, in the United States District Court for the South-

---

1. The Merger was effected by a stock swap; each outstanding common share of Roberts stock was converted into a specified quantity of Shire stock.

ern District of New York. Pursuant to Section 16(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78p(b), the plaintiffs sought to compel the individual defendants to disgorge profits realized through the short-swing sale of Shire shares.

The individual defendants moved on March 9, 2001, to dismiss the complaint for failure to state a claim upon which relief can be granted. They argued that the securities transactions in question qualified for three separate exemptions to Section 16(b) liability: (1) Rule 16a–2(a)—the exemption for transactions by a person prior to his becoming an officer or director of the issuer, 17 C.F.R. § 240.16a–2(a); (2) Rule 3a12–3(b)—the exemption for transactions involving securities of a foreign private issuer, 17 C.F.R. § 240.3a12–3(b); and (3) Rule 16b–3(d)(1)—the exemption for issuer-to-insider transactions approved by the issuer's board of directors, 17 C.F.R. § 240.16b–3(d)(1). The individual defendants also contended that receiving converted stock options as a result of a merger does not constitute the "purchase" of a security within the meaning of Section 16(b).

Oral argument on the motion to dismiss was held on June 26 and July 26, 2001. In a written decision dated August 30, 2001, the District Court agreed that the individual defendants were exempt from Section 16(b) liability under all three of the exemptions raised, but declined to determine whether the acquisition of converted stock options during a merger constitutes the "purchase" of a security covered by Section 16(b).

The plaintiffs appeal the District Court's ruling as to the applicability of all three exemptions to Section 16(b) liability, while the individual defendants reassert their argument concerning the meaning of "purchase" under Section 16(b). Because each of the three exemptions is an independent ground for dismissing the complaint, we affirm the dismissal based solely on Rule 16b–3(d)(1), the exemption for issuer-to-insider transactions approved by the issuer's board of directors. In so doing, we express no opinion in respect of the other two exemptions relied upon by the District Court and we assume, but do not decide, that receiving converted stock options in the context of a merger amounts to the "purchase" of a security as required for Section 16(b) liability.

## DISCUSSION

■ We review *de novo* a district court's grant of a motion to dismiss a complaint made pursuant to Federal Rule of Civil Procedure 12(b)(6). *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir.2002). In assessing the sufficiency of the complaint, we must accept the allegations contained therein as true and draw all reasonable inferences therefrom in favor of the plaintiff. *See King v. Am. Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir.2002). We are also free to consider documents that are incorporated into the complaint by reference or attached to the complaint as exhibits, or whose terms and effect are relied upon by the plaintiff in drafting the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–54 (2d Cir.2002). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.2000).

■ The issue we consider on appeal is whether, by operation of Rule 16b–3(d)(1), the individual defendants' acquisition and sale of Shire securities is exempt from Section 16(b) of the 1934 Securities Exchange Act and its ban against short-swing profit taking by issuer insiders. Rule 16b–3(d)(1) provides, in relevant part, that any

issuer-to-insider transaction "involving a grant, award or other acquisition" of issuer equity securities shall be exempt from Section 16(b) liability if the transaction is "approved by the board of directors of the issuer." 17 C.F.R. § 240.16b–3(d)(1). Accordingly, there are three requirements for a securities transaction to qualify for what we hereinafter refer to as the "Board Approval Exemption":

(1) The transaction must involve the defendant acquiring issuer equity securities from the issuer;

(2) The defendant must be a director or officer of the issuer at the time of the transaction; and

(3) The transaction must be approved in advance by the issuer's board of directors.[2]

We examine each element of the Board Approval Exemption in turn.

## I. Acquisition of Issuer Equity Securities From the Issuer

Here, all of the individual defendants received Shire stock options as part of the Merger. Although each option only gave its holder the right to receive from Shire a predetermined number of shares of Shire stock, for purposes of the rules promulgated under Section 16(b) the acquisition of a securities option is deemed to be equivalent to the acquisition of the security underlying that option. *See* Ownership Reports & Trading by Officers, Dirs. &

Principal Sec. Holders, Exchange Act Release No. 28,869 [1990–1991 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 84,-709, at 81,258 (Feb. 21, 1991) [hereinafter 1991 Release].

## II. Issuer–to–Insider Transaction

According to the plaintiffs' own factual allegations, which are accepted as true on a motion to dismiss, the individual defendants became Shire directors at the same time they received their Shire options. Compl. ¶ 16. Indeed, such an allegation is crucial to the plaintiffs' derivative suit against the individual defendants because, with the exception of one circumstance not relevant here,[3] Section 16(b) liability does not extend to individuals who were neither directors nor other insiders of the issuer when they acquired their issuer equity securities. *See* 15 U.S.C. § 78p(b).

## III. Approval by the Issuer's Board of Directors

Where there are multiple securities transactions involved, as here, the text of Rule 16b–3(d)(1) does not mandate that the issuer's board of directors approve each individual transaction separately. Rather, it is sufficient if the board approves the overall plan of which the subject transactions are but a constituent part, so long as the plan approved is one "pursuant to which the terms and conditions of each transaction are fixed in ad-

2. In lieu of approval by the issuer's full board of directors, Rule 16b–3(d)(1) permits approval by "a committee of the board of directors that is composed solely of two or more Non Employee Directors." 17 C.F.R. § 240.16b–3(d)(1). That aspect of the Board Approval Exemption is not at issue in this appeal.

3. Rule 16a–2(a) sets forth the single circumstance in which an individual can be held liable for short-swing transactions conducted prior to his becoming an officer or director of the issuer. *See* 17 C.F.R. § 240.16a–2(a) ("A

transaction(s) carried out by a director or officer in the six months prior to the director or officer becoming subject to section 16 of the [1934 Securities Exchange] Act shall be subject to section 16 of the Act ... only if the transaction(s) occurred within six months of the transaction giving rise to the Form 4 filing obligation and the director or officer became subject to section 16 of the Act solely as a result of the issuer registering a class of equity securities pursuant to section 12 of the Act.").

vance, such as a formula plan." 17 C.F.R. § 240.16b–3 note 3.

## A. *The Formula Plan*

▪ For guidance as to the manner in which a formula plan under the Board Approval Exemption should fix in advance the terms and conditions of its constituent securities transactions, the Securities and Exchange Commission ("SEC") release accompanying the promulgation of Rule 16b–3(d)(1) points to former Rule 16b–3(c)(2)(ii). *See* Ownership Reports & Trading by Officers, Dirs. & Principal Sec. Holders, Exchange Act Release No. 34–37260, 61 F.R. 30,376, at 30,381 n.71 (June 14, 1996) [hereinafter 1996 Release]. That former rule defined a formula plan as the grant or award of securities "made pursuant to a plan that by its terms . . . sets forth a formula that determines the amount, price and timing, using objective criteria." 17 C.F.R. § 240.16b–3(c)(2)(ii) (amended Aug. 15, 1996). A formula plan must be sufficiently prescriptive in order "to prevent insiders from having, directly or indirectly, any control over the terms of their own awards, and therefore removes the ability of the insiders to time their acquisitions under the plan to take advantage of inside information." 1991 Release at 81,269.

Formula specificity further serves the goal, urged by the SEC as *amicus curiae,* of ensuring that the approving board gives due consideration to the securities transactions that will subsequently flow out of the formula plan, thereby evincing "acknowledgment and accountability" by the board as to its own actions. SEC Amicus Br. at 24 (internal quotation marks omitted). Of course, whether the formulae set forth in a given plan are adequately specific turns on the overall corporate context served by the plan's grant or award of securities. Are the securities being awarded solely as a form of special compensation to a limited number of highly influential insiders? Or are the securities instead being granted to all eligible option holders, without regard to status, as a means of fully effecting an overarching, value-adding corporate event (e.g., a merger)? Clearly, the latter scenario presents a diminished risk that the securities grants are not motivated by a legitimate corporate purpose and, as such, should generally require less in the way of formula specificity.

In respect of the securities transactions at issue in this case, we find that Article VI, Paragraph 6.1(a) of the Merger Agreement encapsulated the formula plan required for purposes of the Board Approval Exemption. All of the relevant terms and conditions of the Roberts–Shire option conversion were fixed within that single passage:

- Who? All holders of Roberts options.
- What do they receive? Shire options.
- When? At "the Effective Time" of the Merger and "without any action on the part of the [Roberts option] Holders."
- In what quantity? An amount equal to the product of (1) the number of Roberts options held by the option holder immediately prior to the merger and (2) a stipulated exchange ratio.
- At what exercise price? A price equal to the exercise price of the old Roberts option divided by the exchange ratio.
- Under what governing terms? The duration and all other exercise terms of the converted Shire options would be identical to those of the old Roberts options.

In the detailed and prescriptive manner demanded of formula plans under former Rule 16b–3(c)(2)(ii), the option conversion provisions contained in Article VI, Paragraph 6.1(a) of the Merger Agreement left Roberts option holders no discretion uni-

laterally to alter in their favor the amount, price, timing and exercise terms of the impending option conversion.[4] Far from being open-ended, the Merger Agreement precisely delimited the securities grants that the individual defendants would ultimately receive on the effective date of the Merger.

The plaintiffs object that the Merger Agreement's formula plan failed to spell out the full names of all the individuals holding Roberts options prior to the Merger, the exact quantity of Roberts options held separately by each such person, and the actual exercise terms governing the Roberts options. *Cf.* Skadden, Arps, Slate, Meagher & Flom L.L.P., SEC No–Action Letter [1999 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 77,515, at 78,565–66 (Jan. 12, 1999) [hereinafter Skadden No Action Letter]. However, while we agree that listing such minutiae would not be *inconsistent* with the Board Approval Exemption, all-encompassing precision is not mandatory in every application of the exemption. This is particularly so where, as here, the three "missing" pieces of information were not free-floating variables manipulable by the future beneficiaries of the Roberts–Shire option conversion.

Whether or not separately identified in the formula plan, *all* holders of Roberts options at the moment of the Merger would receive converted Shire options—

and the Shire board, by approving the formula plan, would so be aware. Whether or not quantified according to individual holdings, *all* extant Roberts options would be converted—and, again, the Shire board would so be aware. Finally, whether or not reprinted verbatim in the Merger Agreement, the terms previously governing the Roberts options would *still* govern the converted Shire options—and, as before, the Shire board would so be aware.

## B. Conditional & Purpose Non Specific Approval

Having concluded that the Merger Agreement contained an appropriate formula plan, we must now decide whether the Merger Agreement received the requisite board approval. That the full Shire board approved the Merger Agreement is made clear from a public document that the plaintiffs concede they relied upon in drafting their complaint. On November 22, 1999, Shire filed with the SEC its Form F–4 Registration Statement Under the Securities Act of 1933 (the "Registration Statement"), appended to which was a copy of the executed Merger Agreement. Within the body of the Registration Statement was a point-by-point summary of the Merger Agreement, including a description of the option conversion plan that mirrored Article VI, Paragraph 6.1(a) of the Merger Agreement.[5] As for the Shire board's ap-

---

**4.** Our conclusion is in no way affected by the plaintiffs' contention that, prior to the effective date of the Merger, there existed the possibility that a Roberts option holder could have exercised all or some of his Roberts options, thereby *decreasing* the total number of Shire options he would have been entitled to receive. Such a scenario would not alter the option conversion plan to the detriment of Shire because the *maximum* number of Roberts options to be converted by Shire was fixed in the Merger Agreement. *See* Merger Agreement art. IV, § 4.2 ("Until the Effective Time ... Roberts shall not ... authorize or

issue ... any Equity Equivalents [e.g., stock options]....").

**5.** The Registration Statement summarized the option conversion plan as follows:

At the effective time, Shire will assume each of Roberts' stock option plans and all options will be adjusted so that each holder of an option will have such option apply to that number of ordinary shares (adjusted to the nearest whole share) equal to the product of the number of all options of such optionee immediately prior to the effective time and the exchange ratio. The exercise

proval of the Merger Agreement, the Registration Statement stated that

> on July 22, 1999, the Shire board met to discuss the merger, the terms of the merger agreement and the proposed exchange ratio. . . . The Shire board then approved the merger agreement . . . , contingent upon approval of a special committee. . . .

Registration Statement at 48–49. The Registration Statement was signed by all of Shire's directors. *See id.* at II–5.

■ The plaintiffs do not challenge the factual accuracy of the Registration Statement, nor do they dispute that the Shire board approved the Merger Agreement on July 22, 1999. Rather, they claim that the *nature* of the July 22 approval—as reflected in the Registration Statement—was of a type insufficient as a matter of law to invoke the Board Approval Exemption. This supposedly fatal deficiency arises from: (1) the "conditionality" of the July 22 approval in that such approval was ultimately conditioned on final approval of the Merger Agreement by a committee of the board [6] as well as final approval of the Merger by Shire's shareholders; and (2) the Shire board's failure to indicate that its approval of the Roberts–Shire option conversion was specifically for purposes of exempting the individual defendants from

Section 16(b) liability. Both of the plaintiffs' arguments are unavailing.[7]

■ First, as observed by *amicus curiae*, once the board has approved an issuer-to-insider transaction involving a grant or award of securities, "it is irrelevant that the grant or award it approved may become final and effective only upon approval by others or the occurrence of other subsequent events." SEC Amicus Br. at 23. This is because the Board Approval Exemption "does not require that board approval be the final definitive event in the grant of securities to an officer or director." *Id.* at 22; *see also* 1996 Release at 30,380 ("If a transaction has satisfied more than one of the alternative approval conditions specified in . . . rule [16b–3(d) ] . . . the issuer may rely on any condition that provides the basis of the exemption."). We thus distinguish between the multiple approval preconditions to the Merger itself—here, board, committee and shareholder approval—and the single board approval precondition to applying the Board Approval Exemption. Only the latter, which we deem satisfied, is at issue in this case.

■ Second, the plaintiffs contend that application of the Board Approval Exemption required the Shire board to approve the option conversion plan with an express indication that its approval was intended to

---

> price per share for each option assumed, adjusted to the nearest pence, will equal the old exercise price per Roberts share divided by the exchange ratio. . . . The duration and other terms of each assumed or replaced option immediately after the effective time will be the same as the corresponding options that were in effect immediately before the effective time.
>
> Registration Statement at 68.

6. It bears noting that even though the Shire board delegated the task of final approval of the Merger Agreement to a committee, the record indicates that the committee's func-

tions were limited to pro forma administrative tasks.

7. Additionally, we summarily reject the plaintiffs' suggestion that the Board Approval Exemption does not apply here because the Shire board approved the option conversion plan in advance of the individual defendants becoming Shire directors. All that is required under Rule 16b–3(d)(1) is that the securities transaction, at the time it subsequently occurs, be between the issuer and a director or officer of the issuer. *See* Skadden No Action Letter at 78,564–65.

invoke the exemption. Although a single SEC no-action letter superficially supports this view, *see* Skadden No Action Letter at 78,566, the SEC in its *amicus* brief now counsels against reading a purpose-specific approval requirement into Rule 16b–3(d)(1). *See* SEC Amicus Br. at 24–26. While we must defer to the SEC's interpretations of its own regulations in its amicus briefs unless they are plainly erroneous or inconsistent with the regulations, *see Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001), SEC no-action letters constitute neither agency rule-making nor adjudication and thus are entitled to no deference beyond whatever persuasive value they might have, *see Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 129 (2d Cir.2001); *N.Y. City Employees' Ret. Sys. v. SEC,* 45 F.3d 7, 13 (2d Cir.1995); *Amalgamated Clothing & Textile Workers Union v. SEC,* 15 F.3d 254, 257 (2d Cir.1994). Indeed, "[e]ven when district courts have ruled in accord with no-action letters, they almost always have analyzed the issues independently of the letters." *N.Y. City Employees' Ret. Sys.,* 45 F.3d at 13.

We find wholly unpersuasive the artificial imposition of purpose-specific approval on the Board Approval Exemption, as did the District Court and the only other court to have addressed this issue. *See Atlantic Tele–Network v. Prosser,* 151 F.Supp.2d 633, 637–42 (D.Vi.2000). The Skadden No–Action Letter provides neither authority nor rationale for requiring purpose-specific approval. Certainly the text of the rule itself contains no suggestion that such a requirement exists. In fact, the rule focuses singularly and objectively on requiring that the terms and conditions of the transaction receive board approval; it mentions nothing about the subjective motivations of the approving body.

■ A requirement of purpose-specific approval would run counter to the very reason why the Board Approval Exemption was established in the first place. As the SEC stated in its release accompanying the promulgation of Rule 16b–3, the provision of "a broader exemption from short-swing profit recovery for transactions between an issuer and its directors or officers ... presented a simplified, flexible approach based on the premise that" transactions between an issuer and its directors or officers

> do not appear to present the same opportunities for insider profit on the basis of non-public information as do market transactions by officers and directors. Typically, where the issuer, rather than the trading markets, is on the other side of an officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute. Based on its experience with the Section 16 rules, the Commission is persuaded that transactions between the issuer and its officers and directors that are pursuant to plans ... that satisfy other objective gate-keeping conditions, are not vehicles for the speculative abuse that section 16(b) was designed to prevent. Accordingly, these transactions are exempted by new Rule 16b–3 as adopted.

1996 Release at 30,377.[8] So long as the relevant securities transaction is between

---

8. It is significant that, because the SEC's 1996 Release is connected to the agency's rule-making function while the Skadden No-Action Letter is not, only the former must be accorded weight by us. *See Chevron U.S.A.,*

*Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[L]egislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the stat-

an issuer and insider, and so long as the terms and conditions of that transaction receive advance approval by the board of directors, there exists sufficient protection to ensure that any short-swing profit taking that follows is not the result of unfair market manipulation. Accordingly, we hold that a securities transaction need not receive purpose-specific approval in order to qualify for the Board Approval Exemption of Rule 16b–3(d)(1).

## CONCLUSION

In conclusion, we find that Rule 16b–3(d)(1) exempts the individual defendants' acquisition and sale of Shire securities from liability under Section 16(b) of the 1934 Securities Exchange Act. The judgment of the District Court dismissing the complaint is affirmed.

ute."); *see also* 3 Thomas Lee Hazen, Law of Securities Regulation § 16.32[2], at 551 (4th ed. 2002) ("It must be remembered, however, that SEC no action letter responses are staff interpretations rather than formal Commission action and thus are of more limited utility than formal rulemaking or policies announced in SEC releases.").