**Mark LEVY, Appellant**

v.

**STERLING HOLDING COMPANY, LLC.; National Semiconductor Corporation; Fairchild Semiconductor International, Inc.**

No. 02–1698.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 2002.

Filed Dec. 19, 2002.

Mitchell M. Twersky, Fruchter & Twersky, New York, NY, Jeffrey S. Abraham (argued), Abraham & Associates, New York, NY, for Appellant.

Steven B. Feirson (argued), Carolyn H. Feeney, Thomas L. Kenyon, Dechert,

Price & Rhoads, Philadelphia, PA, for Appellee Sterling Holding Company, LLC.

Paul Vizcarrondo, Jr. (argued), Michael A. Charish, Wachtell, Lipton, Rosen & Katz, New York, NY, for Appellee National Semiconductor Corporation.

Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Fairchild Semiconductor International, Inc.

BEFORE: NYGAARD, GREENBERG, and MICHEL,* Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. INTRODUCTION

This matter comes on before this court on an appeal from an order granting a motion to dismiss for failure to state a claim on which relief may be granted entered in the district court on February 5, 2002. Plaintiff-appellant, Mark Levy, a shareholder in Fairchild Semiconductor International, Inc. ("Fairchild"), a nominal defendant-appellee not participating in this appeal, brought this shareholder derivative action on November 28, 2000, against defendants-appellees Sterling Holding Co. ("Sterling") and National Semiconductor Corp. ("National") after Fairchild declined to initiate a lawsuit seeking relief for the matters of which Levy complains. Levy by this action seeks a judgment requiring Sterling and National to disgorge what he alleges were "short-swing insider trading profits of more than $72 million" in Fairchild stock. Levy predicates the action on section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), which deprives specified insiders from profiting from certain offsetting purchase and sale securities transactions completed within less than a six-month period. The district court had jurisdiction under section 27 of the Exchange Act, 15 U.S.C. § 78aa, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review on this appeal. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 221 (3d Cir.1998).

### II. HISTORY

In view of the procedural posture of the case we take the facts from Levy's allegations. On March 11, 1997, National spun off Fairchild pursuant to an Agreement and Plan of Recapitalization. At that time National retained in Fairchild 4,380,000 shares of Class A common stock, 5,243,621 shares of Class B common stock (as measured after a four-for-one common stock split on April 29, 1998), and 11,667 shares of 12% Series A cumulative compounding preferred stock. Sterling, on or around the same date, purchased for $58.5 million approximately 3,553,000 shares of Class A common stock, 7,099,000 shares of Class B common stock (as measured after the split), and 53,113 shares of 12% Series A cumulative compounding preferred stock in Fairchild.

On July 1, 1999, a majority of Fairchild's common and preferred shareholders voted to convert all shares of its preferred stock into Class A common stock "automatically" upon completion of a contemplated Initial Public Offering (IPO). Inasmuch as the preferred shares previously had not been convertible into common stock, an amendment of Fairchild's certificate of incorporation was required to effectuate the conversion.[1] On July 26, 1999, a majority of

---

* Honorable Paul R. Michel, Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

1. We were told at oral argument that the conversion was undertaken because the existence of the preferred stock would have been an impediment to the IPO.

the shareholders of all three classes of Fairchild stock approved by written consent a restatement of Fairchild's certificate of incorporation containing an amendment authorizing the conversion. In accordance with a formula in the amendment each share of preferred stock was worth 75.714571 shares of class A common stock. Upon completion of the IPO on August 9, 1999, Sterling and National respectively acquired 4,021,428 and 888,362 shares of Class A common stock. Levy alleges that the conversion of preferred stock into common stock constituted a non-exempt "purchase" by National and Sterling within the meaning of section 16(b) of the Exchange Act.

On January 19, 2000, within six months after the alleged purchase (the conversion), Sterling sold 11,115,000 shares of class A common stock for a profit of $58,511,777, and National sold 7,243,360 shares of class A common stock for a profit of $14,124,958. Levy's complaint alleges that "[t]hese sales are matchable against the purchases [conversions] alleged." While we have some difficulty understanding why there is a matchable situation here in view of Sterling's and National's earlier ownership of class A common stock, we nevertheless at this time accept the allegation as true.

National and Sterling have or had officers who sat on Fairchild's seven-member board of directors pursuant to a Stockholder's Agreement. The agreement, dated March 11, 1997, provided that Sterling would designate two of Fairchild's directors and two of Fairchild's independent directors (subject to the veto of Fairchild's chief executive officer), and that National, if it continued to hold stock in Fairchild, would designate one director who was an executive officer of National. At the times relevant to this action, Fairchild's directors included Sterling's chairman and chief executive officer, the president of Citicorp Venture Capital Ltd. which, Levy alleges, owns an interest in Sterling,[2] and a managing director of Citicorp Venture Capital. In addition, an individual who served as the president, chief executive officer and chairman of National, was on the Fairchild board.

According to a Fairchild prospectus filed on August 4, 1999, National owned 14.8% of Fairchild's class A common stock and 14.9% of class B common stock and Sterling owned 48.0% of its class A common stock and 85.1% of its class B common stock. For this and other reasons, Levy made the uncontroverted allegation that National and Sterling were beneficial owners of more than 10% of Fairchild's outstanding stock.

## III. DISCUSSION

A. Was the reclassification exempted by Rule 16b–7 from section 16(b) or otherwise not included in the section?

### 1. *Statutory Background*

Section 16(b) of the Securities Exchange Act of 1934 requires that any profits earned by insiders through "short-swing" trading must be disgorged, or returned to the issuer of the security. The section provides:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or

---

2. Sterling's disclosure statement included in its brief on this appeal pursuant to Fed. R.App. P. 26.1 and Third Circuit LAR 26.1(b) recites that Citicorp Venture Capital Ltd. owns Sterling.

any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement . . . involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement . . . or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

15 U.S.C. § 78p(b).

The Supreme Court has explained the purpose of section 16(b):

The general purpose of Congress in enacting S 16(b) is well known. . . . Congress recognized that insiders may have access to information about their corpo-rations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors. In § 16(b) Congress sought to 'curb the evils of insider trading (by) . . . taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great.' . . . It accomplished this by defining directors, officers, and beneficial owners as those presumed to have access to inside information and enacting a flat rule that a corporation could recover the profits these insiders made on a pair of security transactions within six months.

*Foremost–McKesson Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243–44, 96 S.Ct. 508, 516, 46 L.Ed.2d 464 (1976) (citing *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591–92, 93 S.Ct. 1736, 1742–43, 36 L.Ed.2d 503 (1973), and citing and quoting *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972)) (footnote omitted).

Section 3(a)(13) of the Securities Exchange Act provides that "[t]he terms 'buy' and 'purchase' each include any contract to buy, purchase, or *otherwise acquire*" any equity security. 15 U.S.C. § 78c(a)(13) (emphasis added). In applying this definition in the section 16(b) context, the Supreme Court has said, "[t]he statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase." *Kern County Land Co.*, 411 U.S. at 593–94, 93 S.Ct. at 1744.

Thus, section 16(b) of the Exchange Act, by requiring insiders to disgorge any profits earned as a result of their short-swing trading of an equity security without regard to their intent, "imposes a strict prophylactic rule" of "liability without fault

within its narrowly drawn limits," *Foremost–McKesson,* 423 U.S. at 251, 96 S.Ct. at 519, to protect against insiders engaging in speculative abuse.

Nevertheless, section 16(b) has its limits and not every transaction that could fall within the definition of "purchase" or "sale" is so treated by that section. Thus, the Exchange Act provides that the SEC may exempt certain transactions from the coverage of the statute. *See* 15 U.S.C. § 78p(b) (The statute "shall not be construed to cover … any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."). Furthermore, the Supreme Court has explained that, as to certain "unorthodox" or "borderline" transactions not meeting the usual definition of purchase or sale, "the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern County Land Co.,* 411 U.S. at 594, 93 S.Ct. at 1744; *see also id.* at 594 n. 26, 93 S.Ct. at 1744 n. 26 ("By far the greater weight of authority is to the effect that a 'pragmatic' approach to § 16(b) will best serve the statutory goals."); *Reliance Elec. Co.,* 404 U.S. at 424 n. 4, 92 S.Ct. at 600 n. 4 ("In interpreting the terms 'purchase' and 'sale,' courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse.").

■ The elements of a claim under section 16(b) are that "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir.1998). There is

no dispute on this appeal as to National's and Sterling's status as insiders or beneficial owners of ten percent or more of the stock and it is undisputed that there were "sales" within the meaning of section 16(b) that occurred within six months of the alleged (and vigorously disputed) "purchases." Thus, the issue on this appeal is whether the "reclassification" transactions upon the conversion of the preferred stock into common stock were non-exempt "purchases" within section 16(b) of the Act. While we recognize that Sterling and National are discrete entities, inasmuch as they appear, at least at this point in the case, to be in the same position, as a matter of convenience we will refer to their "purchases" and "sales" singularly.

2. *Does Rule 16b–7 exempt reclassifications generally from liability under section 16(b)?*

■ We are satisfied that SEC Rule 16b–7, 17 C.F.R. § 240.16b–7, in which the SEC exercises its authority to exempt transactions from section 16(b) does not exempt reclassifications categorically from the section. Our conclusion in this regard differs from that of the district court which determined that Rule 16b–7 exempted reclassifications of stock from the reach of section 16(b) so that a reclassification could not be the opening or purchase leg of a swing transaction subject to section 16(b). It was, of course, this conclusion that led it to grant National's and Sterling's motions to dismiss. According to the district court, "[i]n light of the SEC's own interpretation of its rules and regulations, it seems clear the provisions of Rule 16b–7 apply to reclassifications. It would seem then that reclassifications are exempt from the scope of Section 16(b)." *Levy v. Sterling Holding Co.,* C.A. No. 00–994, at 5–6, 2002 WL 187513 (D.Del. Feb.5, 2002).

■ As we have indicated, section 16(b) explicitly authorizes the SEC to exempt "any transaction . . . as not comprehended within the purpose of" the statute. This section is critical for courts defer to an agency's interpretation of statutes, particularly where the statute provides the agency with authority to make the interpretation. *See Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). In this case, however, the SEC has not set forth its interpretation clearly so our threshold challenge is to ascertain what in fact was its interpretation.

The text of Rule 16b–7, including its title, states:

§ 240.16b–7 Mergers, reclassifications, and consolidations.

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:

(1) The acquisition of a security of a company, pursuant to a merger or consolidation, in exchange for a security of a company which, prior to the merger or consolidation, owned 85 percent or more of either

(i) The equity securities of all other companies involved in the merger or consolidation, or in the case of a consolidation, the resulting company; or

(ii) The combined assets of all the companies involved in the merger or consolidation, computed according to their book values prior to the merger or consolidation as determined by reference to their most recent available financial statements for a 12 month period prior to the merger or consolidation, or such shorter time as the company has been in existence.

(2) The disposition of a security, pursuant to a merger or consolidation, of a company which, prior to the merger or consolidation, owned 85 percent or more of either

(i) The equity securities of all other companies involved in the merger or consolidation or, in the case of a consolidation, the resulting company; or

(ii) The combined assets of all the companies undergoing merger or consolidation, computed according to their book values prior to the merger or consolidation as determined by reference to their most recent available financial statements for a 12 month period prior to the merger or consolidation.

(b) A merger within the meaning of this section shall include the sale or purchase of substantially all the assets of one company by another in exchange for equity securities which are then distributed to the security holders of the company that sold its assets.

(c) Notwithstanding the foregoing, if a person subject to section 16 of the Act makes any non-exempt purchase of a security in any company involved in the merger or consolidation and any non-exempt sale of a security in any company involved in the merger or consolidation within any period of less than six months during which the merger or consolidation took place, the exemption provided by this Rule shall be unavailable to the extent of such purchase and sale.

17 C.F.R. § 240.16b–7. A leading securities law treatise describes Rule 16b–7 as follows:

Rule 16b–7 was initially adopted in 1952. . . . Its theory is that certain types of mergers and the like are of relatively minor significance to the stockholders of the liquidated corporation and present no significant opportu-

nities for trading on the basis of advance information concerning the prospect of a merger.... To provide for such cases, Rule 16b–7 exempts transactions incident to a merger ... or a consolidation when the surviving company was owned to the extent of at least 85 percent by the liquidated company, or when the company whose security is given up held over 85 percent of the combined assets of all the companies undergoing merger or consolidation.

5 L. LOSS & J. SELIGMAN, SECURITIES REGULATIONS § 6(E)(8)(e)(x), at 2474 (3d ed.2001).

Inexplicably, though the title of Rule 16b–7 includes "reclassifications," the text of the rule does not mention the term. While National and Sterling acknowledge this omission, they argue that nevertheless the inclusion of "reclassifications" in the title demonstrates the SEC's intent. In this regard we point out that even though the SEC added the word "reclassifications" to the title of Rule 16b–7 when amending the rule in 1991 without providing a reason for the change, *see* Ownership Reports and Trading, Exchange Act Release No. 34–28869, 56 Fed.Reg. 7242, 7273 (Feb. 8, 1991), it seems unlikely that it did so for no reason. Unfortunately, however, the title and text of the rule, standing alone, do not provide us assistance in our effort to ascertain the SEC's purpose.[3]

In addition to relying on the title of Rule 16b–7 to support its argument that the rule includes reclassifications which thus are exempt from section 16(b), National and Sterling point to an interpretive release that the SEC issued in 1981. Question 142 of this release, and the SEC's answer, both concern reclassifications in part:

> (142) Question: Although not specifically mentioned, does Rule 16b–7 apply to transactions structured as (1) statutory exchanges; (2) liquidations; or *(3) reclassifications?*
>
> Answer: The staff is of the view that, for purposes of Rule 16b–7, a statutory exchange may be the substantive equivalent of a merger, consolidation or sale of assets. Therefore, the acquisition and disposition of stock in a statutory exchange would be exempt under Rule 16b–7, assuming all of the conditions of the rule are satisfied.... A liquidation on the other hand, is not covered by Rule 16b–7 since the liquidation in substance and purpose bears little resemblance to the types of transactions specified in the rule.... Rule 16b–7 does not require that the security received in exchange be similar to that surrendered, and *the rule can apply to transactions involving reclassifications.*

Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 34–18114, 46 Fed.

---

**3.** The proposing releases for the 1991 amendment to Rule 16b–7 do not shed much light either. In one of the proposing releases, the SEC explained that, to address the "very high" "rate of delinquency in Form 3 and 4 filings," it proposed, in part, to "[s]implify[ ] the reporting provisions to focus on timely reporting of those securities transactions that are more discretionary in nature and have greater potential for abuse[,]" Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release

Nos. 34–26333, 35–24768, 53 Fed.Reg. 49997, 50000 (Dec. 13, 1988), and to that end, would propose, "[a]s part of the effort to make the rules less complex, minor language changes to some of the current rules." *Id.* at 50000 n. 41. National also cites to a second release proposing amendments to the SEC's rules, *see* Ownership Reports and Trading, Exchange Act Release No. 34–27148, 35–24942, 54 Fed. Reg. 35667 (Aug. 29, 1989), but this release only identifies the addition of the word "reclassifications" without providing any reason for the change.

Reg. 48147, 48176–77 (Sept. 24, 1981) (emphasis added) (footnotes omitted). Levy asserts that the release, by referring to "transactions involving reclassifications," and making the permissive statement that the rule "can apply to ... reclassifications," suggests that Rule 16b–7 does not provide a blanket exemption for all reclassifications as the answer that the rule "can apply" to reclassifications suggests that sometimes it does not so apply. Appellant's Br. at 15. Levy further notes, correctly, that the illustrative examples contained in Question 142 of the release do not discuss reclassifications. *Id.* at 16.

National takes a different approach as it claims in its brief that the SEC asserted that the amendment of the title of Rule 16b–7 "made no substantive changes to the rule, thereby acknowledging that Rule 16b–7 already exempted stock reclassifications." National Br. at 15 (citing Rules Applicable to Insider Reporting and Trading, Exchange Act Release Nos. 34–28869, 35–25254, 56 Fed.Reg. 7242, 7261 (Feb. 21, 1991)). This argument, however, misconstrues the SEC's announcement as National merely points to a statement in a chart comparing the old and new rules indicating that there was no substantive change in Rule 16b–7. A conclusion that there was no change does not tell us what the rule meant before the amendment.

National and Sterling also cite the SEC's proposed amendments to Form 8–K, which governs reporting requirements for officer and director transactions. *See* Form 8–K Disclosure of Certain Management Transactions, Release No. 33–8090, 34–45742, 67 Fed.Reg. 19914 (Apr. 23, 2002). The SEC proposed an exemption from reporting requirements for transactions that "do not generally appear to reflect management's views of the company's prospects or sever the link between executive compensation and company equity se-

curities performance." *Id.* at 19919. This set of transactions exempt from reporting requirements included "[a]cquisitions or dispositions pursuant to holding company formations and similar corporate reclassifications and consolidations." *Id.* The release indicates that these "are the transactions exempted from Section 16(b) short-swing profit recovery by Exchange Act Rule 16b–7." *Id.* n. 56. Thus, this release also indicates that the SEC considers that certain reclassifications are exempt under Rule 16b–7. But the release does not suggest that all reclassifications are *per se* exempt. Indeed, the release clearly hedges on the point and thus supports a conclusion that some but not all reclassifications are exempt from section 16(b)'s restrictions.

Overall, we are satisfied from our review of the text of Rule 16b–7 and the SEC releases that we have discussed offering the SEC's partial interpretations of the rule that the SEC has not included all reclassifications in Rule 16b–7 and thus has not exempted *all reclassifications* from the reach of section 16(b). On the other hand, the rule must encompass *some* reclassifications. After all, we hardly can conclude otherwise inasmuch as the 1981 release states that Rule 16b–7 "can apply to reclassifications" and the 1991 amendment included the term "reclassifications" in the title of the rule. This conclusion requires us to determine whether the reclassification here is included in the rule.

3. *Is the reclassification here exempt under Rule 16b–7?*

█ In the absence of specific SEC guidance about which reclassifications are exempt from section 16(b) under Rule 16b–7, we believe that two principles should guide us in determining which reclassifications should be included in Rule 16b–7. First, just as Rule 16b–7 limits exemptions

to certain transactions related to mergers and consolidations, so, too, should it impose analogous limits on exemptions for transactions involving reclassifications. Second, the reclassification exemption should extend only to those "transactions . . . not comprehended within the purpose of" section 16(b). 15 U.S.C. § 78p(b).

The text of Rule 16b–7 does not exempt transactions involving all mergers and consolidations, but rather, a limited class of transactions.[4] As one treatise elaborates,

> The Commission has exempted from Section 16(b) combinations effectuated by merger or the purchase of substantially all corporate assets for stock in certain limited situations. In the event a parent combines with a subsidiary or subsidiaries in which it owns 85 percent of the outstanding equity securities, or if a company combines with other companies in a situation in which it owns 85 percent of the combined assets of all the companies prior to the merger, and the parent (or principal asset owner as the case may be) is not the surviving corporation, the corporate combination does not involve a sale of its securities or a purchase of the surviving corporation

securities for purposes of Section 16(b) liability. If the parent (or principal asset owner) is the surviving corporation the rule is not applicable, but on the other hand it is not necessary for Section 16(b) purposes as the corporate combination will not involve a purchase or sale of its shares by its shareholders unless they are also shareholders in the subsidiary. The staff has refused to extend the rule to the latter situation, stating that it was intended to provide an exemption 'for a limited class of mergers which result in technical rather than substantial changes in the affected securities.'

3D HAROLD BLOOMENTHAL & SAMUEL WOLFF, SECURITIES AND FEDERAL CORPORATE LAW § 21:74 (2d ed. & 2002 supp.) (quoting Xidex Corp., SEC No–Action Letter (Mar. 6, 1995), Fed. Sec. L. Rep. (CCH) ¶ 77,928 (Mar. 6, 1995)).[5] Thus, by its terms Rule 16b–7 applies to transactions involving the combination of companies where one company owns at least 85% of the other company or companies involved in the transaction; that is, transactions akin to a short-form merger.

---

**4.** *See, e.g.,* Harvey L. Pitt, *Merger and Acquisition Implications, in* A PRACTICAL GUIDE TO SECTION 16: REPORTING AND COMPLIANCE § 11.3 (Amy L. Goodman, ed.3d ed. 1997 & Supp. 2000) ("Rule 16b–7 contains an exemption of the acquisition or disposition of a security of a company pursuant to certain specified types of mergers, consolidations, and reclassifications that do not result in a 'significant change in the character of the structure of the Company.'") (footnotes and citations omitted).

**5.** National cites this treatise to support its claim that Rule 16b–7 applies to reclassifications. National Br. at 21–22 n. 3. The treatise states:

> Is a statutory reclassification resulting in the exchange of outstanding shares of a corporation for other shares of the same corporation a sale for purposes of Section

16(b)? Rule 145, discussed at § 3:54, now treats such transactions as involving a sale for purposes of the registration provisions of the Securities Act. The Second Circuit early took the view that it was not a sale for Section 16(b) purposes on the ground that it did not afford insiders an opportunity for speculative abuse. While this view was expressed in 1954, it has been cited with approval by the Second Circuit and it is apparent that it would take unique circumstances to convince the Second Circuit to extend Section 16(b) to such transactions. New Rule 16b–7 applies to reclassifications. Bloomenthal & Wolff, 3D SECURITIES AND FEDERAL CORPORATE LAW § 21.75 (footnotes omitted). The reference to the Second Circuit was to its decision in *Roberts v. Eaton,* 212 F.2d 82 (2d Cir.1954), which we cite below.

National argues that Rule 16b–7 was designed to exempt transactions involving at least "85% cross-ownership" because "such transactions change only the form of a shareholder's investment, not its substance, and thus 'do not present significant opportunities to insiders to profit by advance information.'" National Br. at 15–16 (quoting Exemption of Certain Transactions from Section 16(b), Exchange Act Release No. 34–4696, 17 Fed.Reg. 3177, 3177 (Apr. 10, 1952)). According to National, "[r]eclassifications change the form of a shareholder's investment, not its substance, and do not materially alter the character of the enterprise," and, because a reclassification involves the "exchange of securities of the *same* company," there is "100% cross-ownership, so to speak." *Id.* at 16 (emphasis in original).

National and Sterling both cite the SEC's no-action letter[6] in *Monk–Austin*, SEC No–Action Letter, 1992 WL 337451 (Nov. 19, 1992), in support of their positions. But "SEC no-action letters constitute neither agency rule-making nor adjudication and thus are entitled to no deference beyond whatever persuasive value they might have." *Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC*, 298 F.3d 136, 145

(2d Cir.2002) (citations omitted). In *Monk–Austin*, the SEC issued a no-action letter expressing its opinion that Rule 16b–7(a) would exempt a recapitalization transaction "pursuant to which the company's capital structure will be changed through the surrender of currently outstanding shares of Class A common stock, Class B common stock and preferred stock in exchange for a new class of Common Stock, in preparation for an initial public offering." *Monk–Austin*, 1992 WL 337451, at *8. The Commission staff explicitly noted "[i]n this regard ... [the Monk–Austin Company's] representation that shareholders' proportionate interests in the Company will not be changed by the Recapitalization." *Id.*[7]

National and Sterling argue that the SEC considered a situation in issuing the *Monk–Austin* no-action letter directly applicable to this case. Levy responds that here, unlike in *Monk–Austin*, National and Sterling did not maintain proportionate interests in Fairchild, but rather, as a result of the conversion of preferred shares into common stock, experienced a change in their proportionate interests. Appellant's Br. at 19–20.[8] Levy also seeks to distin-

6. Usually issuance of a "no-action" letter means that the SEC does not intend to undertake an enforcement action against the party requesting and receiving such a letter. In this context, then, the term "no action" letter is not precisely accurate, insofar as the Act does not authorize the SEC to enforce section 16(b); rather, that task is left to the issuer of the security, or an owner of the security (e.g., a shareholder). *See Gollust v. Mendell*, 501 U.S. 115, 122, 111 S.Ct. 2173, 2178, 115 L.Ed.2d 109 (1991).

7. Monk–Austin, in its letter, told the SEC that The plan of recapitalization will set forth conversion ratios for the stock. Each outstanding share of preferred stock, which by its terms is currently convertible at the holder's option into shares of current Class

B common stock equal in value to the par value of the preferred ($52 per share), will be converted in the Recapitalization into the number of shares of Common Stock determined by dividing $52 by the initial public offering price. Each share of outstanding Class A common stock and each share of outstanding Class B common stock will be converted into an identical, specified number of shares of Common Stock. Thus, *the shareholders' proportionate interests in the Company will be unchanged in the Recapitalization.*
Monk–Austin, 1992 WL 337451, at *1 (emphasis added).

8. Levy appears to conflate two distinct issues: (1) whether the particular reclassification transaction is exempted by Rule 16b–7 and

guish Monk–Austin on the basis that, whereas in Monk–Austin, the preferred stock was convertible into common stock, in this case it was not. *Id.* at 20. Levy asserts:

> Thus, at issue here is not the reclassification of one type of common stock into ... another economically equivalent class of common stock, but rather the change from the set contractual rights of preferred shareholders to that of complete residual equity ownership embodied by common stock. In other words, Defendants acquired an equity interest they did not own prior to the conversion of the Preferred Stock.

*Id.* Furthermore, Levy argues that "Sterling's proportionate interest in the [Fairchild] Common Stock increase[d] from 48.03% to 52.18% and National Semiconductor's increased from 14.80% to 15.08%." Appellant's Br. at 17. If Levy's allegation that there was a proportionate increase in National's and Sterling's interests in Fairchild as a result of the conversion can be substantiated, *Monk–Austin* is distinguishable. Thus, for this reason alone we will not hold by following *Monk–Austin,* in considering this appeal from an order granting a motion to dismiss, that Rule 16b–7 exempts the reclassification in this case from section 16(b).

We believe that there is a second independent reason why we should not regard, at least at this time, the reclassification here as being within Rule 16b–7. It is undisputed that the preferred stock was not convertible into common stock before the July 26, 1999 amendment to Fairchild's certificate of incorporation. We are of the view that at this stage of the proceedings we must regard the conversion of the preferred stock pursuant to the amendment

as the type of reclassification that the SEC would not have intended to exempt by Rule 16b–7. We reach this conclusion for while we do not suggest that the risks and opportunities of shareholders of nonconvertible preferred stock are divorced from the fortunes of the company involved, still they are very different than the risks and opportunities of shareholders holding common stock.

In this regard we point out that preferred shares ordinarily, at least, have a priority claim to dividends. Thus, a diminution in the company's earnings may have less an impact on the value of its preferred shares than on the value of its common shares. On the other hand, if a company prospers the preferred shareholders may benefit little, if at all, for their dividends may be fixed. Thus, both the upside opportunities and downside risks of preferred and common shareholders are significantly different. While these differences may be lessened when the preferred stock is convertible at the holder's option into common shares, still even in that situation there are differences in risks and opportunities. In this case both the amendment of Fairchild's certificate of incorporation, which made the conversion possible, and the actual conversion took place with the six-month period prior to the January 19, 2000 sales date. In viewing this matter we think that at this time we should regard the reclassification in this case as so changing the risks and opportunities of the preferred shareholders in National and Sterling that the SEC would not have intended to exempt the reclassification from section 16(b) by Rule 16(b)–7. Our conclusion furthers Congress' purpose in enacting section 16(b) by depriving the insiders from obtaining

(2) whether, under the "unorthodox transaction" doctrine, the reclassification transaction constitutes a purchase within the meaning of

section 16(b). As it turns out, however, the two issues conceptually are intertwined.

short-swing profits because of their access to information not available to the investing public.

4. *Even if Rule 16b–7 does not exempt the reclassification transaction at issue, is the transaction one that does not constitute a "purchase" within the meaning of section 16(b) of the Securities Exchange Act?*

 Of course, our conclusion that the SEC did not intend to exempt all reclassifications from section 16(b) and would not have intended to exempt the transactions here still leaves us with the fundamental question whether, without regard for the SEC's position, the reclassification was a statutory purchase within section 16(b). There is little recent case law on whether reclassifications are section 16(b) purchases. In a footnote in *Kern County Land Co.* the Supreme Court stated that reclassifications are among those transactions labeled "unorthodox." *See Kern County Land Co.*, 411 U.S. at 593 n. 24, 93 S.Ct. at 1744 n. 24 ("The term ... has been applied to stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants.") (citing 2 L. LOSS, SECURITIES REGULATION 1069 (2d ed.1961)).[9] This specific identification of reclassifications confirms that we should undertake the pragmatic analysis that the Supreme Court has described: "the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern County*

*Land Co.*, 411 U.S. at 594, 93 S.Ct. at 1744. As *Kern County* counsels, to determine whether an "unorthodox" transaction constitutes a purchase, a court must ask whether the transaction gives rise to the potential for the type of speculative abuse that Congress enacted section 16(b) to prevent.

Levy cites *Colan v. Mesa Petroleum Co.*, 951 F.2d 1512 (9th Cir.1991), for the proposition that a changed exposure to market risk is a factor suggesting the potential for speculative abuse. In *Colan*, the Court of Appeals for the Ninth Circuit reversed a district court's grant of summary judgment to the defendants in a case where the plaintiff in a shareholder derivative suit had sued prospective acquirers of a target company for short-swing profit liability under section 16(b). The principal issue was whether an exchange of common stock for debt securities constituted a "sale" under section 16(b). *Id.* at 1518. The court of appeals concluded that the exchange was neither automatic nor involuntary, and determined that the volitional nature of the exchange rendered it a sale under section 16(b). Significantly for our purposes, the *Colan* court emphasized that the "nature of the ... [d]efendants' investment was changed [as] [t]hey exchanged common stock for negotiable debt securities with a higher market value," thus changing the character of their risk. *Id.* at 1525.

Here, the amendment to the certificate of incorporation provided that the conversion of preferred to common would occur automatically upon the IPO. We recognize, therefore that the conversion itself was thus not voluntary. However, the process

---

9. Often courts treat the term "unorthodox transactions" as meaning transactions that are neither purchases nor sales, and in addition, do not give rise to the potential for speculative abuse. But the term, as described in *Kern*, appears to mean only those transactions that do not meet the usual understanding of purchase or sale and for which it is necessary to engage in the inquiry whether the transactions may allow for speculative abuse.

by which the certificate was changed was voluntary in the sense that interested parties voted on the question.

Regardless of whether or not the conversion was volitional, however, the question remains whether the transaction had the potential for speculative abuse. We are convinced that we should not hold, as a matter of law, that the transaction lacked that potential. Taking all allegations as true and drawing all reasonable inferences in favor of Levy, it seems at least possible that he can demonstrate the presence of facts consistent with the allegations in the complaint to show that the reclassification transaction had the potential for speculative abuse. *Cf., e.g., Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) ("[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). This is particularly so inasmuch as Sterling and National were the dominant shareholders and controlled at least three seats on Fairchild's Board of Directors. *See Roberts v. Eaton,* 212 F.2d 82, 85 (2d Cir.1954) (contrasting situation in that case to situation "where an insider controls and can work his will through the board of directors") (citing *Park & Tilford v. Schulte,* 160 F.2d 984, 988 (2d Cir.1947)). We also reiterate that the reclassification involved a conversion of previously nonconvertible preferred stock into common stock that at this stage of the case we must hold materially changed National's and Sterling's risks and opportunities. *See Colan,* 951 F.2d at 1525.[10]

Our conclusion that the district court erred in granting the motion to dismiss is in accord with a recent decision from the District of Delaware contrary to that of the district court here. In *Rosenberg v. Harris Corp.,* No. Civ.A. 01–518–SLR, 2002 WL 1459502 (D.Del. June 10, 2002) (mem.order), the court denied a motion to dismiss in a shareholder derivative lawsuit involving facts remarkably similar to those here. The district court rejected the defendants' argument that the reclassification of Intersil Corp.'s preferred stock into common stock pursuant to an amended certificate of incorporation, when the conversion took place on the same day as Intersil's IPO, was exempted under Rule 16b–7 from section 16(b) liability. *Id.* at *1–*2. The district court observed that:

with the exception of [the district court's decision in] *Levy,* no court has exempted a reclassification, under the ambit of Rule 16b–7 or otherwise, as a matter of law. Rather, courts have considered the facts and circumstances surrounding each transaction before concluding that a particular transaction did not pose the risk of speculative, insider 'short-swing trading' profits that Section 16(b) sought to prevent.

*Id.* at *2. The court explained "that the SEC has never expressly exempted all reclassifications from Section 16(b), just as all mergers and consolidations are not exempt—only mergers and consolidations that meet specific, strict guidelines are exempt as a matter of law." *Id.*

In summary we conclude that Rule 16b–7 does not exempt the reclassification from section 16(b) and that the reclassification is not, for other reasons, outside the scope of the section. While we acknowledge that this case is difficult we believe that our result is consistent with Congress' intentions and Rule 16b–7.

---

**10.** In *Colan* the risk was reduced because common stock was exchanged for debt securities but in our view it does not matter whether the conversion enhanced or reduced the risks involved. The point is that the risks were changed.

**B. Does SEC Rule 16b–3 exempt the reclassification?**

■ National and Sterling argue that, even if we do not hold that Rule 16b–7 exempts reclassifications generally or that the transaction here is an exempt reclassification, we nonetheless should affirm the district court on the alternate ground they advanced in that court, but which it had no reason to consider, that SEC Rule 16b–3 exempts the transaction from the rule. Plainly, if we agreed with that contention we would affirm as a court "may affirm a judgment on any ground apparent from the record, even if the district court did not reach it." *Kabakjian v. United States,* 267 F.3d 208, 213 (3d Cir.2001).

■ Rule 16b–3, entitled "Transactions between an issuer and its officers or directors," provides, as relevant to this case:

(a) *General.* A transaction between the issuer (including an employee benefit plan sponsored by the issuer) and an officer or director of the issuer that involves issuer equity securities shall be exempt from section 16(b) of the Act if the transaction satisfies the applicable conditions set forth in this section.

(b) *Definitions.*

(1) A *Discretionary Transaction* shall mean a transaction pursuant to an employee benefit plan . . .

(2) An *Excess Benefit Plan* shall mean an employee benefit plan that is operated in conjunction with a Qualified Plan . . .

(3)(i) A *Non–Employee Director* shall mean a director who:

(A) Is not currently an officer (as defined in § 240.16a–1(f)) of the issuer or a parent or subsidiary of the issuer, or otherwise currently employed by the issuer or a parent or subsidiary of the issuer;

(B) Does not receive compensation, either directly or indirectly, from the issuer or a parent or subsidiary of the issuer, for services rendered as a consultant or in any capacity other than as a director, except for an amount that does not exceed the dollar amount for which disclosure would be required pursuant to § 229.404(a) of this chapter;

(C) Does not possess an interest in any other transaction for which disclosure would be required pursuant to § 229.404(a) of this chapter; and

(D) Is not engaged in a business relationship for which disclosure would be required pursuant to § 229.404(b) of this chapter.

(ii) Notwithstanding paragraph (b)(3)(i) of this section, a *Non–Employee Director* of a closed-end investment company shall mean a director who is not an 'interested person' of the issuer, as that term is defined in Section 2(a)(19) of the Investment Company Act of 1940.

(4) *A Qualified Plan* . . .

(5) *A Stock Purchase Plan* . . .

(c) *Tax-conditioned plans.* . . .

(d) *Grants, awards and other acquisitions from the issuer.* Any transaction involving a grant, award or other acquisition from the issuer (other than a Discretionary Transaction) shall be exempt if:

(1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non–Employee Directors;

(2) The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or

represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; *provided that* such ratification occurs no later than the date of the next annual meeting of shareholders; or

(3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such acquisition, *provided that* this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security.

(e) *Dispositions to the issuer.* Any transaction involving the disposition to the issuer of issuer equity securities (other than a Discretionary Transaction) shall be exempt, *provided that* the terms of such disposition are approved in advance in the manner prescribed by either paragraph (d)(1) or paragraph (d)(2) of this section.

(f) *Discretionary Transactions* . . . .

17 C.F.R. § 240.16b–3 (emphasis added).

National and Sterling argue that Rule 16b–3(d), which exempts "[g]rants, awards, and other acquisitions from the issuer," exempts the reclassification transaction. In particular, they contend that the con-

version of their preferred stock holdings into common stock constitutes a transaction that (1) was approved by the issuer's (Fairchild's) board of directors; and (2) was approved by a majority of shareholders entitled to vote, either of which circumstance suffices to trigger the rule's exemption. National Br. at 50 & n. 13; Sterling Br. at 45–46. Levy disagrees with their contention as he urges that Rule 16b–3 by its terms is not applicable here.

According to Levy, the term "other acquisitions" in Rule 16b–3(d) cannot mean "any" and "all" other transactions for several reasons. First, Levy argues that the principle of *ejusdem generis* supports construing the term "other acquisitions" in Rule 16b–3's exemption of grants, awards, and "other acquisitions" as constrained within a category that includes grants and awards. Appellant's Br. at 25–27; Appellant's Reply Br. at 18–20. In other words, Rule 16b–3(d) does not, in Levy's view, apply to *all other* acquisitions, but only those that contain some element of compensation. Appellant's Br. at 26–27; Appellant's Reply Br. at 18–26. Second, Levy asserts that the SEC's regulatory history surrounding Rule 16b–3(d) suggests that we should limit the rule to compensatory transactions. Appellant's Br. at 23–24; Appellant's Reply Br. at 21–23.

Third, Levy argues that Rule 16b–3(f) is more restrictive than the interpretation of Rule 16b–3(d) National and Sterling advance to the extent that Rule 16b–3(f), regulating "discretionary transactions" involving employee benefit plans, requires a six-month waiting period between purchases and sales.[11] Levy states that it

---

**11.** A *discretionary transaction* is
a transaction pursuant to an employee benefit plan that:
(i) Is at the volition of a plan participant;
(ii) Is not made in connection with the participant's death, disability, retirement or termination of employment;

(iii) Is not required to be made available to a plan participant pursuant to a provision of the Internal Revenue Code; and
(iv) Results in either an intra-plan transfer involving an issuer equity securities fund, or a cash distribution funded by a

would be irrational for the SEC to impose greater restrictions on transactions pursuant to an employee benefit plan, as such transactions provide "less opportunity for speculative abuse and serve a legitimate compensatory purpose." Appellant's Br. at 28.[12]

National and Sterling counter by pointing to the text of the SEC's 1996 release adopting Rule 16b–3. National Br. at 51–52; Sterling Br. at 48–49. As National and Sterling note, the release states that

New Rule 16b–3 exempts from short-swing profit recovery any acquisitions and dispositions of issuer equity securities . . . between an officer or director and the issuer, subject to simplified conditions. A transaction with an employee benefit plan sponsored by the issuer will be treated the same as a transaction with the issuer. However, unlike the current rule, a transaction need not be pursuant to an employee benefit plan or any compensatory program to be exempt, nor need it specifically have a compensatory element.

Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Release Nos. 34–37260, 35–26524, 61 Fed.Reg. 30376, 30378–79 (June 14, 1996) (footnotes omitted). Levy asserts, however, that "the mere fact that the transaction does not need . . . to have a *specifically* compensatory element does not mean that the transaction does not

need to have *any* compensatory element whatsoever. . . . In fact, what *specifically* implies is that there still needs to be some compensatory element to the transaction even if it is not the primary one." Appellant's Reply Br. at 23–24 (emphasis in original).

Our review of the adopting release convinces us that Rule 16b–3 primarily is concerned with employee benefit plans. The release indicates that the new rule was adopted in part to encourage participation in employee benefit plans:

In February 1991, in response to developments in the trading of derivative securities, the growth of complex and diverse employee benefit plans, and substantial filing delinquencies, the Commission adopted comprehensive changes to the beneficial ownership and short-swing profit recovery rules and forms applicable to insiders pursuant to section 16. While many aspects of the new section 16 rules were favorably received, unanticipated practical difficulties arose in implementing the new rules, particularly with respect to thrift and similar employee benefit plans. In particular, issuers and insiders stated that the application of current Rule 16b–3 to these plans is cumbersome, presents significant record-keeping problems and discourages insiders from participation in plan funds holding employer securities.

---

volitional disposition of an issuer equity security.

17 C.F.R. § 240.16b–3(b)(1).

Rule 16b–3(f) provides:

*Discretionary Transactions.* A Discretionary Transaction shall be exempt only if effected pursuant to an election made at least six months following the date of the most recent election, with respect to any plan of the issuer, that effected a Discretionary Transaction that was:

(1) An acquisition, if the transaction to be exempted would be a disposition; or

(2) A disposition, if the transaction to be exempted would be an acquisition.

*Id.* § 240.16b–3(f).

**12.** Levy makes a fourth argument that "the rule as a whole only speaks to transactions between an issuer and an officer or director who is a natural person." Appellant's Br. at 32. This argument, however, is premised upon the argument that Rule 16b–3(d) deals with transactions involving compensation; it does not have any independent force.

Ownership Reports and Trading, 61 Fed.Reg. at 30376 (footnotes omitted). The adopting release further explained that the 1995 proposals being adopted, which included the proposed new Rule 16b–3, were related to compensation:

The 1995 proposals presented a simplified, flexible approach based on the premise that transactions between an issuer and its officers and directors are intended to provide a benefit or other form of compensation to reward service or to incentivize performance. Generally, these transactions do not appear to present the same opportunities for insider profit on the basis of non-public information as do market transactions by officers and directors. Typically, where the issuer, rather than the trading markets, is on the other side of an officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute. Based on its experience with the Section 16 rules, the Commission is persuaded that transactions between the issuer and its officers and directors that are pursuant to plans meeting the administrative requirements and nondiscrimination standards of the Internal Revenue Code and the Employee Retirement Income Security Act of 1974 ("ERISA"), or that satisfy other objective gate-keeping conditions, are not vehicles for the speculative abuse that section 16(b) was designed to prevent. Accordingly, these transactions are exempted by new Rule 16b–3 as adopted.

*Id.* at 30377 (footnotes omitted).[13] The release explained specifically the impetus behind new Rule 16b–3(d):

Plans that authorize 'grant and award' transactions provide issuer equity securities to participants on a basis that does not require either the contribution of assets or the exercise of investment discretion by the participants. For example, awards of bonus stock pursuant to a salary-based formula and grants of options or restricted stock are grant and award transactions. In contrast, a 'participant-directed transaction' requires the participant to exercise investment discretion as to either the timing of the transaction or the assets into which the investment is made. For example, the exercise of an option and a participant's election pursuant to a thrift plan to invest either the employee or the employer contribution in issuer equity securities are participant-directed transactions.

Both the current and the new rules provide a specific exemption for the grant or award of issuer equity securities. The new rule makes the exemption more readily available, since only one of three alternative conditions need be satisfied.

*Id.* at 30380. The release further explained that, whereas the 1995 proposal referred only to "grants" and "awards," the term "other acquisitions" was added to account for the participant-directed transactions mentioned above.

Commenters responded favorably to this proposal. They expressed concern, however, that some participant-directed transactions (such as deferrals of bonuses into phantom stock and other de-

---

**13.** National argues that the sentence in the above-quoted language beginning with "Typically ..." supports a broad reading of the term "other acquisitions" in Rule 16b–3. *See* National Br. at 50. Levy argues that "[t]his quote is ... taken entirely out of context." Appellant's Reply Br. at 24. Whether true or not, in any event, it is clear that the surrounding language is concerned with compensation.

ferred compensation programs) that are exempt under the current rule would lack an exemption under the new rule. The 1995 proposal was intended to permit such transactions, which ordinarily do not present opportunities for abuse, an opportunity for exemption.

Accordingly, as adopted, the proposed grant and award exemption has been retitled 'Grants, Awards and Other Acquisitions from the Issuer' to make it clear that participant-directed acquisitions that are not pursuant to tax-conditioned plans may rely on this exemption. . . .

*Id.* (footnotes omitted).[14] This statement, as well as the others previously cited, in the SEC's adopting release strongly suggest that the SEC intended, in Rule 16b–3(d), to exempt "grants, awards, and other acquisitions" with some compensatory nexus and thus the rule is inapplicable here.

We acknowledge that the statement that "a transaction need not . . . to be exempt . . . specifically have a compensatory element," 61 Fed.Reg. at 30379, appears to cut against our position. This statement, however, can be read to mean that the form of a transaction is not what matters. Rather, the weight of the SEC's pronouncements on Rule 16b–3, and particularly Rule 16b–3(d), suggest that the transaction should have some connection to a compensation-related function.

The result we reach is sensible. We think that adopting National's and Sterling's view would result in any transaction between the issuer company and an officer or director that meets the remaining requirements of Rule 16b–3(d)—approval of the transaction by the board of directors or a majority of shareholders, or holding of the securities by the officer or director for more than six months [15]—being immunized from section 16(b) liability. The potential for self-dealing could be great: in a closely held corporation, directors or a majority of shareholders could arrange for the acquisition of stock in advance of an IPO, and turn around and sell shares shortly after the IPO. Because of their insider status, there would be a concern about speculative abuse injurious to other market participants.

*Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC,* 298 F.3d 136 (2d Cir.2002), is not to the contrary. In Gryl, the Court of Appeals for the Second Circuit held that Rule 16b–3(d) exempted from section 16(b) transactions involving the grant of stock options to insider-directors of an issuer company, Roberts, and the subsequent conversion of those options to options in Shire, the company with which Roberts merged, pursuant to a merger plan. *See Gryl,* 298 F.3d at 139, 146. These stock options, however, had a compensatory nexus.[16]

---

**14.** Sterling argues that the cited language of the release "does not, however, suggest that 'participant-directed' acquisitions, together with grant and award transactions, are the *only* types of transactions eligible for exemption under Rule 16b–3(d)." Sterling Br. at 49 (emphasis in original). Instead, Sterling points to another part of the release, *see id.*, which states that "[o]ther acquisitions by an officer or director from the issuer, including grants, awards and participant-directed transactions, will be exempt upon satisfaction of any one of three alternative conditions." 61 Fed.Reg. at 30377. Sterling argues that the

transactions encompassed by Rule 16b–3(d) include, but are not limited to, grants, awards, and participant-directed transactions, and that *any* transaction meeting one of the required conditions should be exempt. Sterling Br. at 49–50.

**15.** This list is a paraphrase of the alternative conditions for exemption in Rule 16b–3(d).

**16.** Levy makes an alternative argument that if National's and Sterling's interpretation of Rule 16b–3(d) is correct the SEC exceeded its

## IV. CONCLUSION

In view of the foregoing, we hold that the district court erred in granting the motion of National and Sterling to dismiss Levy's complaint for failure to state a claim on which relief can be granted. We disagree with the district court's holding that Rule 16b–7 exempted the reclassification transaction as a matter of law and we do not conclude at this time that the reclassification transaction is outside the definition of "purchase" under section 16(b). We also reject the alternative basis that National and Sterling have advanced for supporting the judgment below—Rule 16b–3(d)—as inapplicable. Thus, we will reverse the order of February 5, 2002, dismissing this action and will remand the matter to the district court for further proceedings consistent with this opinion.

authority in enacting the rule. In view of our result we do not consider this point.