Marc **BRUH**, Plaintiff–Counter–Defendant–Appellant,

v.

**BESSEMER VENTURE PARTNERS III L.P.**, Defendant–Counter-claimant–Appellee,

**Vistacare, Inc.,** Defendant.

**Docket No. 05–5271–cv.**

United States Court of Appeals, Second Circuit.

Argued: April 7, 2006.

Decided: Sept. 13, 2006.

Jeffrey S. Abraham (Mitchell M.Z. Twersky and Ximena Skovron, on the brief), Abraham Fruchter & Twersky, LLP, New York, NY, for Plaintiff–Counter–Defendant–Appellant.

Vincent T. Chang (Frederick R. Kessler, on the brief), Wollmuth Maher & Deutsch LLP, New York, NY, for Defendant–Counterclaimant–Appellee.

Eric Summergrad, Deputy Solicitor, Securities and Exchange Commission (Allan A. Capute, Special Counsel to the Solicitor; Brian G. Cartwright, General Counsel; and Jacob H. Stillman, Solicitor), Washington, DC, for Amicus Curiae Securities and Exchange Commission.

Before McLAUGHLIN, CABRANES, Circuit Judges, and GLEESON, District Judge.[1]

GLEESON, Judge.

Marc Bruh, a shareholder in VistaCare, Inc. ("VistaCare"), brought this action against Bessemer Venture Partners III, L.P. ("Bessemer"), pursuant to § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), seeking disgorgement of the profit Bessemer made when it sold shares of VistaCare common stock on May 13, 2003. The question presented on appeal is whether a stock reclassification—converting Bessemer's preferred stock into common—that occurred in December 2002

---

1. The Honorable John Gleeson, United States District Judge for the Eastern District of New York, 1 sitting by designation.

can properly be matched against that sale and thus give rise to liability for short-swing insider trading under § 16(b). The United States District Court for the Southern District of New York (George B. Daniels, *Judge*) granted summary judgment for the defendants, and we affirm, though we arrive at that result by a different route.

## BACKGROUND

The relevant facts are not in dispute. In 1995 Bessemer purchased 305,292 shares of Series A–1 preferred stock in Vista Hospice Care, Inc. ("VHS") for $9.90 per share. By a recapitalization in 1998, VHS became a wholly-owned subsidiary of VistaCare, and Bessemer's shares in VHS were converted to Series A–1 preferred shares in VistaCare. Bessemer then, and at all times relevant thereafter, owned more than ten percent of VistaCare's stock and was therefore subject to § 16(b) liability as a statutory insider.[2]

In 1999 the VistaCare shareholders adopted a Third Amended and Restated Certificate of Incorporation, which provided:

> Upon the closing of a Qualified Initial Public Offering ["IPO"], each outstanding share of Series A–1 Preferred Stock shall automatically be converted into a number of shares of Class A Common Stock equal to (i) the Original Issue Price of the Series A–1 Preferred Stock (as adjusted for any stock splits, stock dividends, recapitalizations and similar events), plus all accrued but unpaid dividends on such shares . . ., divided by (ii) the per share price at which the Common Stock is sold to the public in the . . . [IPO].

Two aspects of this provision are worthy of note. First, the conversion formula ensured that the aggregate value of Bessemer's investment in VistaCare would remain the same through the conversion: the greater the IPO price relative to the value of each of Bessemer's preferred shares, the fewer common shares Bessemer would receive, and vice versa. Second, the conversion was to be automatic. After negotiating the Third Amended Certificate, Bessemer did not retain the option of keeping its preferred shares in the event of a "[q]ualified" IPO, nor did it have the right to convert its preferred shares to common at any earlier time.

On December 17, 2002, VistaCare announced a Qualified IPO[3] and set the price of the offering at $12.00 per share. On

---

2. Section 16(b) applies to "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security." 15 U.S.C. § 78p(a)(1).

3. Whether an IPO "[q]ualified" was complicated. Specifically, a "Qualified Initial Public Offering" was defined as "a public offering of Common Stock managed by a nationally recognized investment banking firm pursuant to a registration statement filed with the Commission setting forth an anticipated public offering price range, the mid-point of which is equal to or greater than the greater of: (i) $7.50 per share (appropriately adjusted for stock splits, stock dividends, recapitalizations and similar events) or (ii) the lesser of (A) $12.50 per share (appropriately adjusted for stock splits . . . [etc.]) or (B) three times the Conversion Price of the Series B Preferred Stock, and which would, based on such midpoint, result in gross proceeds to the Corporation and/or selling stockholders of at least $25,000,000." Thus, the qualifying midpoint price—"equal to or greater than the greater of" those two defined quantities—was merely a floor, below which the conversion provision would not be triggered; contrary to Bruh's suggestion at oral argument, there was no ceiling price, above which an IPO would not qualify.

December 23, 2002, the deal closed, and Bessemer's preferred stock was converted into 251,865 shares of common stock. Trading opened at $15.90 per share. On May 13, 2003, VistaCare made a secondary offering of stock at $20.00 per share. Although Bessemer had requested that the secondary offering be delayed (perhaps in the hope of avoiding this lawsuit by allowing the six-month time frame in which short-swing trading is prohibited to expire), VistaCare declined, and Bessemer sold anyway. At the net price of $18.95 per share, compared to the $12.00 per share IPO price, Bessemer earned a profit of $1,725,275.25 on the 251,865 shares it acquired by the conversion of its preferred shares.[4] This action followed.

The district court granted summary judgment for Bessemer, concluding that "[t]he 'purchase' in the instant matter occurred at the time Bessemer contracted, ... in 1995, to acquire [VHS] Preferred Stock." That, the district court held, was "when Bessemer's rights and obligations became fixed and irrevocable." [SA 8.] Bruh appealed, and we invited the Securities and Exchange Commission ("SEC") to participate as *amicus curiae*.

## DISCUSSION

■■ We review the district court's grant of summary judgment *de novo, see Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.2003), and we may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court, *see Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir.1997).

■■ Congress enacted § 16(b) "[f]or the purpose of preventing the unfair use of information" by corporate insiders trading securities issued by the company they manage or in which they hold a significant ownership interest. 15 U.S.C. § 78p(b).[5]

**4.** We note that $6.95, the profit per share, multiplied by 251,865 shares equals $1,750,461.75. The record does not disclose why the profit Bruh seeks to recover is approximately $25,000 less, but neither the difference nor the reason for it has any bearing on this appeal.

**5.** Section 16(b) provides:

Profits from purchase and sale of security within six months

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act) involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act) involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

The mechanism adopted to that end is "a flat rule taking the profits out of a class of transactions"—so-called "short-swing" transactions involving a stock purchase and sale (or sale and purchase) by an insider within a period of less than six months—"in which the possibility of abuse was believed to be intolerably great," *Kern County Land Co., v. Occidental Petroleum Corp.*, 411 U.S. 582, 592, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) (internal quotation marks omitted). Any profit realized from such a transaction is recoverable by the corporation in a suit against the insider, brought either by the corporation itself or, as in this case, on behalf of the corporation by a shareholder.

Congress further provided, however, that § 16(b) "shall not be construed to cover ... any transaction or transactions which the [Securities and Exchange] Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b). One such exemption, Rule 16b–7, 17 C.F.R. § 240.16b–7, is the focus of the dispute between the parties here. And because that rule was amended by the Commission in 2005, after the transactions giving rise to this case took place, *see Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Release No. 52202, 70 Fed.Reg. 46080 (Aug. 9, 2005) (hereinaf-ter "2005 Release"), the case implicates two versions of the Rule 16b–7 exemption.

Bruh contends that under the old Rule 16b–7, as interpreted by the Third Circuit in *Levy v. Sterling Holding Company*, 314 F.3d 106 (3d Cir.2002), the conversion of Bessemer's preferred stock into common was not exempt. He further contends that to the extent the new Rule 16b–7 would exempt that conversion, it may not be applied retroactively, *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Bessemer, with support from the Commission, argues that the new Rule 16b–7 is merely the old Rule properly understood. The Third Circuit's decision in *Levy*, they contend, was issued only "[i]n the absence of specific SEC guidance" on the question, 314 F.3d at 114, and that guidance having now been supplied, the Commission's reasonable interpretation of its own rule is entitled to deference under *Bowles v. Seminole Rock & Sand Company*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see also Auer v. Robbins*, 519 U.S. 452, 461–62, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

■ We hold that the Commission's construction of the old Rule 16b–7 is not plainly erroneous, and it is therefore controlling.[6] So construed, the rule relieves Bessemer of liability here.

---

**6.** The district court approached the case from the opposite direction, asking first whether the conversion of Bessemer's preferred stock into common constituted a "purchase" under § 16(b). It cited our advice in *Blau v. Lamb*, 363 F.2d 507, 518 (2d Cir.1966) that "in deciding whether a certain transaction is a Section 16(b) 'purchase' or 'sale' it is relevant to first consider whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent." *See also Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) ("In interpreting the terms 'purchase' and 'sale,' courts have

properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse."). Concluding that Bessemer's operative "purchase" occurred in 1995—a determination as to which we express no opinion—the district court had no need to consider Bessemer's argument that Rule 16b–7 exempted this transaction.

Although consideration—as a threshold matter—of whether a transaction constitutes a "purchase" may be necessary when it is clear that no exemption applies, *see At Home Corp. v. Cox Commc'ns, Inc.*, 446 F.3d 403, 408–10 (2d Cir.2006), such threshold consid-

## A. Seminole Rock Deference

■ We do not examine the Commission's exemptive rules with fresh eyes. Rather, in the "interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he administrative interpretation ... becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Seminole Rock*, 325 U.S. at 413–14, 65 S.Ct. 1215; *see also Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir.2000) ("We are bound by the SEC's interpretations of its regulations in its *amicus* brief, unless they are plainly erroneous or inconsistent with the regulations.") (internal quotation marks omitted); *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 16 (2d Cir.2001) (deference owed to SEC's interpretation of rules implementing § 16(b) when "neither plainly erroneous nor inconsistent with the regulations"). It is "axiomatic that the [agency's] interpretation need not be the best or most natural one by grammatical or other standards.... Rather, the [agency's] view need be only reasonable to warrant deference." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). We are thus obligated to accept the Commission's interpretation of Rule 16b–7—here expressed both by the Commission's *amicus* brief and by the 2005 amendments to the rule itself—so long as it represents "a plausible construction of the language of the actual regulation," *Ehlert v. United States*, 402 U.S. 99, 105, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971); *see also Northern Indiana Pub. Serv. Co. v. Porter*, 423 U.S. 12, 15, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975) (agency interpretation must "sensibly conform[ ] to the purpose and wording of the regulations").[7]

We pause briefly to explain the grounds for such deference, which greatly inform our decision here. Like the deference owed under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to an agency's reasonable construction of a statute it administers, *Seminole Rock* deference is justified both by the agency's special expertise in the subject matter— and we have recently acknowledged that the SEC is "an agency uniquely experienced in confronting short-swing profiteering," *At Home*, 446 F.3d at 409—and by its relative political accountability. As the Court explained in *Chevron*, the resolution of ambiguities in legal texts will more often turn on policy preferences than parsing:

> Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to

---

eration is not necessary where, as here, the transaction arguably falls under one of the enumerated exemptions. In such a case, it may be possible to resolve the parties' claims solely on the ground that the Commission has exercised its delegated authority to exempt the transaction in question. Accordingly, we examine that possibility before proceeding, if necessary, to analyze the statutory language.

**7.** The views expressed in the Commission's *amicus* brief are the views of the Commission itself and not merely of the staff. *See* Brief of the Securities and Exchange Commission as *Amicus Curiae, At Home Corp. v. Cox Commc'ns, Inc.*, No. 05–115–CV, at 25–26 (2d Cir., Feb., 2006).

inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

*Chevron,* 467 U.S. at 865–66, 104 S.Ct. 2778. Accordingly, the Court concluded, when Congress delegates policymaking authority to an agency for the purpose of administering a statute, such authority is presumed to include the interpretive discretion to resolve ambiguities in the statutory scheme. Following *Chevron,* the Court has supported *Seminole Rock* deference by a similar presumption: "Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). Agencies have an additional advantage in interpreting their own regulations, namely, that because the agency promulgates the regulations, it is in a superior position "to reconstruct the purpose of the regulations in question." *Id.* at 153, 111 S.Ct. 1171. Here, Congress explicitly delegated to the Commission the policymaking authority to exempt certain transactions "as not comprehended within

the purpose of this subsection," and took the further step of admonishing the courts that the statute "shall not be construed" otherwise. 15 U.S.C. § 78p(b).[8]

With these principles in mind, we turn to Rule 16b–7.

### B. *Rule 16b–7*

█ We first note that under either version of Rule 16b–7, old or new, the conversion of Bessemer's preferred stock into common is exempt only if it can properly be called a "reclassification." Although the term "reclassification" has never been defined in the text of the rule, the release notes accompanying the 2005 amendments provide this explanation:

> [T]ransactions that are exempt as reclassifications generally include transactions in which the terms of the entire class or series are changed, or securities of the entire class or series are replaced with securities of a different class or series of securities of the company, and all holders of the reclassified class or series are entitled to receive the same form and amount of consideration per share.... These transactions ... do not involve a substantial change in the business owned, do not involve the holders' payment of consideration in addition to the reclassified class or series of securities, and have the same effect on all holders of the reclassified class or series....

2005 Release, 70 Fed.Reg. at 46085.

We agree with the Commission that the automatic conversion of Bessemer's preferred stock into common was "a classic

---

**8.** Bruh argues that because the Commission lacks the authority to bring its own enforcement actions pursuant to § 16(b), the usual rule of deference under *Seminole Rock* should not apply to the Commission's rules exempting transactions from § 16(b) liability. We held otherwise in *Levy v. Southbrook Int'l* *Investments, Ltd.,* 263 F.3d at 16, and for the reasons just explained—Congress explicitly delegated policymaking authority to the Commission, which is "uniquely experienced in confronting short-swing profiteering," *At Home,* 446 F.3d at 409—we see no reason to retreat from that position.

reclassification .... encompass[ing] the simple exchange of one entire series of stock, VistaCare preferred stock, for another series of stock, VistaCare common stock, under circumstances where the holders of the preferred stock received the same form and amount of consideration per share." Bruh's only argument to the contrary is entirely unpersuasive.[9] He contends that Bessemer did not regard the conversion at issue as a reclassification because the Third Amended and Restated Certificate requires that reclassifications be approved by "the affirmative vote or written consent of ... two-thirds or more of the then outstanding shares of" preferred stock, and there is no evidence that such a vote ever took place after the requirement came into effect. But the very same Third Amended and Restated Certificate, which was itself "duly adopted by both the Board of Directors and the stockholders of the Corporation in accordance with the ... General Corporation Law of the State of Delaware," required, upon a Qualified IPO, that all Series A–1 preferred stock be *automatically* converted into common stock. Because the Third Amended Certificate thus required no further approval for this transaction, the fact that no further approval was sought does not tend to show that Bessemer regarded the conversion as something other than a reclassification.

Our primary task, therefore, is to determine the extent to which the pre–2005 Rule 16b–7 exempted reclassifications. The rule then provided, in relevant part:

Mergers, reclassifications, and consolidations.

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:

(1) The acquisition of a security of a company, pursuant to a merger or consolidation, in exchange for a security of a company that before the merger or consolidation, owned 85 percent or more of either:

(i) The equity securities of all other companies involved in the merger or consolidation, or in the case of a consolidation, the resulting company; or

(ii) The combined assets of all the companies involved in the merger or consoli-

---

**9.** In his supplemental brief responding to the Commission's *amicus* filing, Bruh asserts two new arguments in this regard. These arguments, which are not based on any point raised by the Commission that Bessemer had not already advanced, come too late for our consideration. *See United States v. Yousef,* 327 F.3d 56, 115 (2d Cir.2003) (argument forfeited because not raised in initial appellate brief). In any event, we do not find them compelling. The first—that the Commission is required to borrow from state law in defining the term "reclassification," rather than adopting its own definition as it did in the 2005 Release, 70 Fed.Reg. at 46085—means nothing to this case unless Bruh is also correct in suggesting that the conversion at issue here failed to satisfy the requirements of shareholder assent under Delaware law. That suggestion is rejected, as we explain in the text: the Third Amended Certificate was itself adopted in accordance with Delaware law, and the automatic conversion at issue here required no further approval. Bruh's second forfeited argument is based on his theory that the fixing of the IPO price, and thus the conversion ratio, constituted a "purchase" within the meaning of Rule 16b–6(a) by establishing a call equivalent position. The fixing of the purchase price, Bruh contends, should be considered separately from the conversion and can be matched independently against the May 2003 sale. The Commission disagrees, stating: "Both the December 17 fixing of the conversion price and the December 23 conversion of preferred into common are eligible for the Rule 16b–7 exemption, since they were both steps in the reclassification." We agree with the Commission. Indeed, it would make little sense to *exempt the reclassification as a whole but* impose separate liability for the component steps in that process.

dation, computed according to their book values before the merger or consolidation as determined by reference to their most recent available financial statements for a 12 month period before the merger or consolidation, or such shorter time as the company has been in existence.

The Commission had amended Rule 16b–7 in 1991 to add the word "reclassifications" to the title, but not to the text, *see Ownership Reports and Trading By Officers, Directors and Principal Security Holders*, Exchange Act Release 28869, 56 Fed.Reg. 7242, 7273 (Feb. 21, 1991) ("1991 Release"), thus creating a glaring ambiguity: just how did the Commission mean for the rule to apply to reclassifications? The Commission amended Rule 16b–7 again in 2005, this time inserting "reclassification" throughout: each instance of "merger or consolidation" became "merger, reclassification or consolidation." The Commission contends that the 2005 amendments merely clarified its prior understanding of the rule, namely "that reclassifications are exempt under the same standards as mergers and consolidations." In other words, the Commission's answer is that the 1991 change in the title was meant to apply throughout the rule. That interpretation, argues the Commission, which is evidenced by both the 2005 amendments and its *amicus* brief in this case, is entitled to deference.

In assessing that argument, it is helpful to consider whether the Commission's current interpretation is consistent with how it has treated reclassifications under Rule 16b–7 in the past. *See Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988) (noting the relevance of "indications of the Secretary's intent at the time of the regulation's promulgation" in determining whether deference to administrative construction of regulation is appropriate). Rule 16b–7 was originally

promulgated in 1952, and it mentioned only "mergers and consolidations." *See Exemption of Certain Transaction from Section 16(b)*, Exchange Act Release No. 4717, 17 Fed.Reg. 5501 (June 19, 1952, and corrected July 18, 1952 at 17 Fed.Reg. 6579). The courts were left to deal with reclassifications case-by-case, and no black-letter rule emerged; in determining whether a certain transaction could possibly give rise to the speculative abuse § 16(b) was aimed at preventing, courts weighed such factors as whether the defendant's proportionate interest in the issuer remained the same through the transaction, whether the transaction was disclosed to and approved by the shareholders, and whether all shareholders in the class were treated alike. *See Roberts v. Eaton*, 212 F.2d 82, 85 (2d Cir.1954) (collecting early cases).

In 1981, the Commission published a statement "setting forth the views of its Division of Corporation Finance on various interpretive questions regarding the rules promulgated under Sections 16(a) and 16(b)," *Interpretive Release on Rules Applicable to Insider Reporting and Trading*, Exchange Act Release No. 34–18114, 46 Fed.Reg. 48147 (Sept. 24, 1981) ("Interpretive Release"), in which it undertook to answer the following question: "Although not specifically mentioned, does Rule 16b–7 apply to transactions structured as (1) statutory exchanges; (2) liquidations; or (3) reclassifications?" *Id.* at 48176–77. With respect to reclassifications, the Commission staff sparsely responded that "Rule 16b–7 does not require that the security received in exchange be similar to that surrendered, and the rule can apply to transactions involving reclassifications." *Id.* at 48177. As Bruh points out, that response standing alone does not clear up the issue: Does "can apply" mean "applies," or in-

stead that the rule applies merely to some but not all reclassifications? Does "transactions involving reclassifications" mean simply "reclassifications," or does it import that a reclassification alone is somehow insufficient without a complementing step?

Taken in context, however, the reasoning the Commission advances here—that reclassifications are exempt where they are the substantive equivalent of a merger that would be exempt under the rule—comes into focus through the explanation it gave concerning transactions structured as a "statutory exchange," which immediately preceded the response concerning reclassifications in the Interpretive Release:

> The staff is of the view that, for purpose[s] of Rule 16b–7, a statutory exchange may be the substantive equivalent of a merger, consolidation or sale of assets. Therefore, the acquisition and disposition of stock in a statutory exchange would be exempt under Rule 16b–7, assuming all of the conditions of the rule are satisfied....
>
> [For example, suppose] Company B is a savings and loan association organized in the State of Virginia. Company A, a wholly-owned subsidiary of Company B, was incorporated under the laws of Virginia for the sole purpose of acquiring all the outstanding shares of capital stock of Company B. The purpose was

to create a holding company which would be able to acquire other savings and loan institutions in Virginia. Under Virginia law, Company B is not permitted to acquire stock of other savings and loan associations. As a result of the exchange, Company B became a wholly-owned subsidiary of Company A, and the former Company B shareholders became the owners of all the outstanding shares of Company A. This transaction was implemented pursuant to statutory procedures under Virginia law.... The acquisition by Company B stockholders of common stock of Company A and the corresponding disposition of the Company B stock in exchange fall within the terms of Rule 16b–7.

*Id.* at 48177. The Commission uses that same logic in its *amicus* brief in this case:

> In relevant respects a reclassification is little different from a merger exempted by Rule 16b–7. In both cases, all stock in a class is exchanged on terms that have been approved by the board and/or shareholders. The exchange occurs on a class-wide basis.... Indeed, the similarities between the two can be readily seen by the fact that a reclassification could also be effected by the issuer creating a new shell company, capitalizing it, merging the old company into the new, and then exchanging stock in the old company for stock in the new.[10]

10. Bruh argues, without any elaboration, that the Commission is wrong on this point because the "shell company" merger described would actually be a non-exempt liquidation, which the Commission explained in a second illustration following the Virginia example quote above:

> Illustration (2): Company X is a holding company whose principal asset is 100,000 shares of Company Y common stock, roughly 6 percent of the total number of shares of such stock issued and outstanding. Company X proposes to liquidate so that its shareholders will hold the stock of

Company Y directly. Pursuant to the liquidation plan, shareholders of Company X will exchange their shares of Company X for those of Company Y on a pro rata basis.

> Interpretation: The acquisition and disposition of such shares is not exempt under Rule 16b–7. This transaction is not substantially similar to a merger or consolidation, nor does it meet the standards of paragraph (a) of the rule which provides that the acquisition and disposition of securities in connection with a merger or consolidation is exempt from

Thus, according to the Commission, the greater exemption for short-form mergers implicitly includes the lesser exemption for a reclassification that is a functional equivalent.

The Commission next addressed the issue in 1991, as we explained above, when it amended the title (and only the title) of Rule 16b–7 to include "reclassifications." 1991 Release, 56 Fed.Reg. at 7242, 7273. The Commission provided no explanation for the amendment except to note that it intended no "substantive" change to the rule. *Id* at 7261–62. It did include a chart updating the 1981 Interpretive Release where necessary to account for the 1991 amendments, but there was no change to the interpretation quoted above concerning reclassifications. *Id.*

In April 2002, a few months before the VistaCare IPO, the Commission issued a proposed rule amending Form 8–K, which sets forth reporting requirements similar to those under Section 16(a), 15 U.S.C. § 78p(a), for transactions involving officers and directors. The Commission proposed that "[a]cquisitions or dispositions pursuant to holding company formations and similar corporate reclassifications and consolidations" be exempt from reporting on the ground that "[t]hese are the transactions exempted from Section 16(b) short-swing profit recovery by Exchange Act Rule 16b–7." *Form 8–K Disclosure of Certain Management Transactions,* 67 Fed.Reg. 19914, 19919 & n. 56 (Apr. 23, 2002). That statement also lacks perfect

clarity, but it is certainly consistent with the position the Commission maintains here, namely, that Rule 16b–7 exempts reclassifications "under the same standards as mergers and consolidations."

Shortly thereafter—in fact, during the week between the fixing of VistaCare's IPO price and the closing—the Third Circuit decided *Levy v. Sterling Holding Company,* 314 F.3d 106 (3d Cir.2002). In that case, the plaintiff alleged that an automatic conversion of previously non-convertible preferred stock into common stock in preparation for an IPO constituted a non-exempt "purchase" under § 16(b). The district court dismissed the complaint on the ground that Rule 16b–7 provided an exemption, but the Third Circuit reversed. Proceeding "[i]n the absence of specific SEC guidance about which reclassifications are exempt from section 16(b) under Rule 16b–7," *id.* at 114, the court concluded that the transaction was not exempt, in part on the ground that "the risks and opportunities of shareholders of nonconvertible preferred stock ... are very different than the risks and opportunities of shareholders holding common stock," *id.* at 117.

Bruh urges us to adopt the Third Circuit's approach in *Levy* as the correct view of Rule 16b–7 prior to the 2005 amendments, and, given the factual similarity between the two cases, to decide this case in his favor. But even if we found *Levy* persuasive [11] and not distinguishable,[12] we

Section 16(b) where 85 percent or more of the assets or securities of all other companies involved in the transaction is owned by another party to the transaction.
1981 Release, 46 Fed.Reg. at 48177. It seems to us that the "shell company" merger the Commission suggests is nearly identical to the Virginia example and to be distinguished, for the reasons the Commission

gave, from the second example involving a liquidation.

11. The Commission argues convincingly that *Levy's* reliance on the different risks and opportunities associated with preferred and common shares is contrary to the SEC's 1981 interpretation that "Rule 16b–7 does not require that the security received in exchange be similar to that surrendered." Interpretive Release, 46 Fed.Reg. at 48177. Indeed, as

now have precisely what the Third Circuit lacked when conducting its inquiry in that case: the answer to whether "the conversion of the preferred stock ... [w]as the type of reclassification that the SEC would ... have intended to exempt by Rule 16b–7" *Levy*, 314 F.3d at 117. The Commission has stated, through both its *amicus* brief in this case and the 2005 amendments to Rule 16b–7, its view that a reclassification is exempt where it is the "substantive equivalent" of a merger that would be exempt. That view, we think, is plausible in light of the 1991 addition of "reclassifications" to the title of the rule and can reasonably be reconciled with the regulatory history of the Commission's treatment of reclassifications. As the Supreme Court has explained, "[w]here ... a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744 n. 3, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). We similarly conclude it is proper here to credit the Commission's current authoritative construction of its own regulation.

In so holding, we acknowledge that we could have proceeded differently in analyzing this case. A reasonable alternative approach would have been to ask first whether Rule 16b–7, as amended in 2005, exempts the conversion at issue (a question we would answer in the affirmative), and then proceed to determine whether the new rule has impermissible "retroac-

tive effect" within the meaning of *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."), and the cases following it explaining retroactivity doctrine. *See Landgraf v. USI Film Prod.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("[T]he court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."); *I.N.S. v. St. Cyr.*, 533 U.S. 289, 321, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *Arenas–Yepes v. Gonzales*, 421 F.3d 111, 117 (2d Cir.2005). We think the question of whether the current Rule 16b–7 would have retroactive effect if applied to the transaction at issue here turns primarily upon the answer we have given above, namely, that even applying the prior Rule 16b–7, according to the Commission's reasonable interpretation, the transaction is exempt. Needless to say, where applying the old rule produces the same result as would the new rule, there is no impermissible retroactive effect.

Finally, we disagree with Bruh's contention that this transaction did indeed present the danger of unfair use of insider information, and therefore the Commission

the Commission points out, "if the original security and the security for which it is being exchanged were precisely the same, there typically would be little need for a reclassification at all."

12. The Third Circuit was careful to point out that in *Levy*, "both the amendment of Fairchild's certificate of incorporation, which

made the conversion possible, and the actual conversion took place with the six-month period prior to the January 19, 2000 sales date," 314 F.3d. at 117, whereas in this case, the Third Amended Certificate requiring the automatic reclassification was adopted nearly three years before the reclassification.

was without authority to exempt it. On that score, Bruh again faces an uphill battle, for as we have explained above, the Commission's interpretation of § 16(b), embodied in the amended Rule 16b-7, is entitled to *Chevron* deference so long as it represents a permissible understanding of Congress's intent.[13] Indeed, the implementation of Congress's objectives—and thus the decision as to whether certain transactions are exempt—falls primarily to the Commission, and not to the courts. The statute's prohibitions explicitly do not "cover any transactions *which the Commission by rules and regulations may exempt* as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b) (emphasis added).

The purpose of § 16(b) was clearly articulated by Congress and fully supports the Commission's interpretation. Section 16(b) was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by" insiders. *Id.* Bruh's theory of potential harm in this case is that Bessemer could have used its insider position to push the price of the IPO artificially downward. Whatever advantage Bessemer may have thus gained, however, it was not an *informational* advantage, which, as the statutory text makes clear, was the only type of insider advantage Congress intended § 16(b) to strip away. There is no allegation that any of the information in the various registration statements filed in connection with the VistaCare IPO was false, misleading, or incomplete in any way. And even if Bessemer did have access to information that the IPO would be priced below an honest assessment of the company's value, Bessemer would not have been in a position to act on it in any way with respect to its preferred shares, since Bessemer had agreed in 1999 that those shares would be automatically converted to common stock no matter how high the IPO price was. Moreover, Bessemer's shares were converted along with the entire class of stock, and, as Judge Clark observed more than fifty years ago, it cannot "be gainsaid that like treatment of all stockholders will in most cases remove the possibility of abuse." *Roberts v. Eaton*, 212 F.2d 82, 84 (2d Cir.1954).

In sum, Bruh has not advanced any convincing theory of how the reclassification at issue gave Bessemer an opportunity to exploit insider information to speculative advantage sufficient to overcome the strong presumption of validity the Commission's exemptive rules enjoy.

## CONCLUSION

For the reasons set forth above, we conclude the reclassification of Bessemer's preferred stock into common stock in preparation for the VistaCare IPO was exempt from § 16(b) liability under Rule 16b-7, and that such an exemption falls safely within the Commission's delegated authority. The judgment of the district court is accordingly AFFIRMED.

---

13. In *At Home,* we reserved the question of whether *Chevron* deference was due an interpretation of § 16(b) adopted by the Commission for the first time in an *amicus* brief, that is, on an issue as to which the Commission had never exercised its rulemaking authority. 446 F.3d at 409 & n. 5. We need not decide that question today because the Commission's position in this case was adopted not only in an *amicus* brief, but also "by rules and regulations," 15 U.S.C. § 78p(b), the very procedure Congress prescribed in delegating exemptive authority to the Commission.